14-3063

IN THE

# United States Court of Appeals

## FOR THE THIRD CIRCUIT

❖

ARROWPOINT CAPITAL CORP.,

*Plaintiff-Appellant,*

—v.—

ARROWPOINT ASSET MANAGEMENT, LLC; ARROWPOINT PARTNERS GP, LLC;
ARROWPOINT PARTNERS GP2, LLC; ARROWPOINT FUNDAMENTAL
OPPORTUNITY FUND, LP; ARROWPOINT STRUCTURED OPPORTUNITY FUND, LP,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**BRIEF FOR PLAINTIFF-APPELLANT AND JOINT APPENDIX
VOLUME I OF VI
(PAGES JA-1 TO JA-23)**

CORBY C. ANDERSON
MATTHEW S. DEANTONIO
NEXSEN PRUET
227 West Trade Street, Suite 1550
Charlotte, North Carolina 28202
(704) 339-0304

MICHAEL W. ARRINGTON
PARKOWSKI, GUERKE & SWAYZE
800 King Street, Suite 203
Wilmington, Delaware 19801
(302) 594-3333

*Attorneys for Plaintiff-Appellant*

## United States Court of Appeals for the Third Circuit

## Corporate Disclosure Statement and
## Statement of Financial Interest

No. <u>14-3063</u>

### ARROWPOINT CAPITAL CORP.,

v.

ARROWPOINT ASSET MANAGEMENT, LLC; ARROWPOINT PARTNERS
GP, LLC; ARROWPOINT PARTNERS GP2, LLC; ARROWPOINT
FUNDAMENTAL OPPORTUNITY FUND, LP; and ARROWPOINT
STRUCTURED OPPORTUNITY FUND, LP.

<u>Instructions</u>

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. An original and three copies must be filed. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

**Arrowpoint Capital Corp.**

(Name of Party)

1) For non-governmental corporate parties please list all parent corporations: None.

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

None.

3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

NONE

4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A.

**/s/ Corby C. Anderson**

(Signature of Counsel or Party)

Dated: 6/30/2014

rev: 12/1998                    (Page 2 of 2)

ii

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..................................................... i

TABLE OF CONTENTS ...................................................................................... iii

TABLE OF AUTHORITIES ............................................................................... vi

JURISDICTIONAL STATEMENT ...................................................................... 1

STATEMENT OF THE ISSUES ........................................................................... 3

STATEMENT OF RELATED CASES .................................................................. 4

STATEMENT OF THE CASE .............................................................................. 5

    I.    FACTUAL BACKGROUND ..................................................................... 5

        A.    Arrowpoint Capital and Its Arrowpoint Marks. .................................. 5

        B.    Appellees and Their Marks. ................................................................ 7

        C.    Evidence of Actual Confusion. .......................................................... 11

        D.    Damages Resulting from Confusion. .................................................. 17

    II.    PROCEDURAL HISTORY ...................................................................... 19

SUMMARY OF THE ARGUMENT ................................................................... 22

ARGUMENT ........................................................................................................ 24

    I.    ARROWPOINT CAPITAL IS ENTITLED TO A PRELIMINARY
        INJUNCTION. ........................................................................................ 24

        A. Standard of Review. ............................................................................ 24

        B. The district court committed an error of law by discounting
            Arrowpoint Capital's evidence of non-customer confusion in
            violation of Third Circuit precedent. .................................................. 25

        C. This Court should grant a Preliminary Injunction rather than
            remand to the district court for additional factual
            determinations. .................................................................................... 32

1. *Arrowpoint Capital is likely to succeed on the merits of its Lanham Act claims.*.................................................................33

   a. The parties' respective marks are similar (Lapp factor one).................................................................35

   b. Arrowpoint Capital's Mark is strong (Lapp factor two)...........................................................................37

   c. Consumer care and sophistication are high (Lapp factor three)................................................................39

   d. Actual confusion occurred almost immediately (Lapp factor four)......................................................40

   e. Appellees knew about Arrowpoint Capital before adopting "Arrowpoint" as a mark (Lapp factor five)..................41

   f. Arrowpoint Capital and Appellees market their services through the same trade channels (Lapp factor seven)....................................................43

   g. Arrowpoint Capital and Appellees target the same prospects, and their investment services are similar (Lapp factors eight and nine)......................................44

2. *Arrowpoint Capital Will Suffer Irreparable Harm Without an Injunction.* .....................................................47

3. *The Balance of the Equities Tips in Arrowpoint Capital's Favor.*.................................................................48

4. *An Injunction Is in the Public Interest.*.............................................50

II. THE DISTRICT COURT ERRED BY DENYING ARROWPOINT CAPITAL'S MOTIONS TO SUPPLEMENT THE RECORD WITH ADDITIONAL EVIDENCE OF ACTUAL CONFUSION. .....................51

A. Standard of Review..............................................................51

B. The district court was required to consider Arrowpoint Capital's evidence of actual confusion, and its failure to do so constitutes an abuse of discretion. .........................................52

III. UPON REMAND, THIS CASE SHOULD BE REASSIGNED TO A DIFFERENT DISTRICT COURT JUDGE...........................................55

    A. Standard of Review.................................................................55

    B. The District Court's Delay in Deciding the Injunction Motion Would Cause a Reasonable Person to Question the District Court's Impartiality.................................................................56

**CONCLUSION**...................................................................61

**STATEMENT REGARDING ORAL ARGUMENT** .......................................62

**CERTIFICATE OF BAR MEMBERSHIP**...........................................63

**CERTIFICATE OF COMPLIANCE WITH RULE 32(A)** ..............................64

**CERTIFICATE OF DIGITAL SUBMISSION**.....................................65

**CERTIFICATE OF FILING AND SERVICE** ....................................66

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

American Tel. & Tel. Co. v. Winback & Conserve Program,
Inc., 42 F.3d 1421 (3d Cir. 1994). ..........................................................24, 50

Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d
1240 (3d Cir. 1983)..........................................................................24

Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199
(3d Cir. 2009)..........................................................................51, 53–54

Acxiom Corp. v. Axiom, Inc., 27 F. Supp. 2d 478 (D. Del.
1998). ..........................................................................43

Adams v. Freedom Forge Corp., 204 F.3d 475 (3d Cir. 2000). ..............................47

Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp., 376 F.3d 8 (1st
Cir. 2004). ..........................................................................27, 31

Bill Salter Adver., Inc. v. City of Brewton, Al., 486 F.Supp.2d
1314 (3d Cir. 2007)..........................................................................56

Brooks v. Cent. Bank of Birmingham, 717 F.2d 1340 (11th Cir.
1983). ..........................................................................56–57

Champions Golf Club, Inc. v. Champions Golf Club, Inc., 78
F.3d 1111 (6th Cir. 1996). ..........................................................28–30, 39

Checkpoint Sys., Inc. v. Check Point Software Techs., Inc., 269
F.3d 270 (3d Cir. 2001). ..........................................................32–33, 36

Country Floors, Inc. v. Gepner, 930 F.2d 1056 (3d Cir. 1991). ............25–27, 29, 36

Draper Commc'ns, Inc. v. Delaware Valley Broadcasters Ltd.
P'ship, 505 A.2d 1283 (Del. Ch. 1985)..........................................33, 47–48

Duraco Prods., Inc. v. Joy Plastic Enters., Ltd., 40 F.3d 1431
(3d Cir. 1994)..........................................................................24

Ferrari S.P.A. v. Roberts, 944 F.2d 1235 (6th Cir. 1991)........................................27

First Keystone Fed. Sav. Bank Life Ins. Co. of Mass. v. SBLI
    USA Mut. Life Ins. Co., C.A. No. 00-3255, 2000 U.S.
    Dist. LEXIS 17178, at *49 (E.D. Pa. Nov. 29, 2000). ...........................36–37

Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466 (3d
    Cir. 1994)....................................................................................................35

Frito-Lay, Inc. v. Morton Foods, Inc., 316 F.2d 298 (10th Cir.
    1963). ..........................................................................................................52

Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha, 754
    F.2d 591 (5th Cir. 1985). ...........................................................22, 27, 35, 52

Garcia v. Newtown Twp., 483 F. App'x 697 (3d Cir. 2012)...............................51

Grand Heritage Mgmt., LLC v. Murphy, No. 06CIV.5977NRB,
    2007 WL 3355380, at *7 (S.D.N.Y. Nov. 7, 2007). ....................................27

Haines v. Liggett Grp. Inc., 975 F.2d 81 (1992)...............................................55

Ideal Indus., Inc. v. Gardner Bender, Inc., 612 F.2d 1018 (7th
    Cir. 1979)....................................................................................................48

In re Baby Prods. Antitrust Litig., 708 F.3d 163 (3d Cir. 2013). ....................51–52

Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983). ...................*passim*

Joint Anti-Fascist Comm. v. McGrath, 341 U.S. 123 (1951)................................55

K2 Advisors, LLC v. K2 Volatility Fund, LP, No. 02-CIV-
    3984, 2002 WL 31235701, at *14 (S.D.N.Y. Oct. 4,
    2002). ..........................................................................................................40

Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700 (3d
    Cir. 2004). ............................................... 22, 24, 26, 32–33, 42, 47, 50, 58–59

Marshall v. Jerrico, Inc., 446 U.S. 238 (1980). ................................................55

Mid-State Aftermarket Body Parts v. MQVP, Inc., 466 F.3d
    630 (8th Cir. 2006). ................................................................................27, 31

Morningside Grp. v. Morningside Capital Grp., 182 F.3d 133
        (2d Cir. 1999)...............................................................28–31, 37, 39

Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck
        Consumer Pharm. Co., 290 F.3d 578 (3d Cir. 2002). .............48–49

Ofc. Comm. Baseball v. Markell, 579 F.3d 293 (3d Cir. 2009). .....................56–57

Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d
        187 (3d Cir.1990)...............................................................47–48, 50

Reedy v. Borough of Collingswood, 204 F. App'x 110 (3d Cir.
        2006). ...............................................................................51

S&R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371 (3rd Cir.
        1992) ...............................................................................23, 47

Sabinsa Corp. v. Creative Compounds, LLC, 609 F.3d 175, 187
        (3d Cir. 2010)...................................................................48

Sanofi-Aventis v. Advancis Pharm. Corp., 453 F. Supp. 2d 834
        (D. Del. 2006). .................................................................42

Swartzwelder v. McNeilly, 297 F.3d 228 (3d Cir. 2002) ...............................24

Syntex Labs., Inc. v. Norwich Pharmacal Co., 437 F.2d 566 (2d
        Cir.1971). ........................................................................26

United States v. Bergrin, 682 F.3d 261 (2012)................................................55, 57

United States v. City of New York, 717 F.3d 72 (2d Cir. 2013)............................59

United States v. Kennedy, 682 F.3d 244 (3d Cir. 2012). .....................................55

United States v. McDavid, 41 F.3d 841 (2d Cir. 1994)..........................................55

W.L. Gore & Assocs., Inc. v. Totes, Inc., 788 F.Supp 800, 810
        (D. Del. 1992). ..................................................................47

World Carpets, Inc. v. Dick Littrell's New World Carpets, 438
        F.2d 482 (5th Cir. 1971). ...................................................35

Wynn Oil Co. v. Am. Way Serv. Corp., 943 F.2d 595, 603 (6th
    Cir. 1991) ................................................................................................41

Yang v. City of Chicago, 137 F.3d 522 (7th Cir. 1998). ...................................56–57

## STATUTES

15 U.S.C. § 1114 ............................................................................................1, 19, 33

15 U.S.C. § 1125 ............................................................................................1, 19, 33

28 U.S.C. § 1292 .........................................................................................................2

28 U.S.C. § 1331 .........................................................................................................1

28 U.S.C. § 1367 .........................................................................................................1

28 U.S.C. § 2106 .......................................................................................................55

Del. Code Ann. tit. 6, § 2532 ............................................................................19, 34

## RULES

Fed. R. Civ. P. 65 .....................................................................................................24

Fed. R. App. P. 4 .........................................................................................................2

## OTHER SOURCES

Restatement (Third) of Unfair Competition, § 23. ............................................25, 35

Thomas J. McCarthy, McCarthy on Trademarks and Unfair
    Competition §§ 23:13, 23:48 (West 2009). ...................................................52

## JURISDICTIONAL STATEMENT

Plaintiff-Appellants Arrowpoint Capital Corp. ("Arrowpoint Capital") brought the underlying lawsuit to protect its ARROWPOINT trademarks against infringement by Defendants-Appellees Arrowpoint Asset Management, LLC ("Arrowpoint Asset"), Arrowpoint Partners GP, LLC ("Arrowpoint Partners 1") Arrowpoint Partners GP2, LLC ("Arrowpoint Partners 2"), Arrowpoint Fundamental Opportunity Fund, LP ("Arrowpoint Fundamental Fund"), and Arrowpoint Structured Opportunity Fund, LP ("Arrowpoint Structured Fund"). Arrowpoint Capital asserted claims under Sections 32 and 43(a) the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and claims under Delaware statutory and common law. J.A. 47–52. The district court had jurisdiction over the Lanham Act claims based on federal question jurisdiction. See 28 U.S.C. § 1331. The district court had supplemental jurisdiction over the Delaware law claims because "they form part of the same case or controversy under Article III of the United States Constitution." See 28 U.S.C. § 1367(a).

On February 26, 2010, Arrowpoint Capital filed a Motion for Preliminary Injunction ("Injunction Motion"). J.A. 113–14. On August 20, 2012, and April 15, 2013, Arrowpoint Capital moved to supplement the record with additional evidence of actual confusion that occurred while the Injunction Motion was pending and undecided ("First Motion to Supplement" and "Second Motion to

Supplement"). J.A. 176–78, 2721–32. On September 18, 2013, the district court denied the First Motion to Supplement. J.A. 2. On March 25, 2014, the district court denied the Second Motion to Supplement. J.A. 3. On May 20, 2014, the district court entered a memorandum and order denying the Injunction Motion ("Injunction Order"). J.A. 4–23. On June 17, 2014, Arrowpoint Capital filed its Notice of Appeal of those three orders. J.A. 1.

The appeal is timely because Arrowpoint Capital served the Notice of Appeal within 30 days of the Injunction Order. See Fed. R. App. P. 4(a)(1)(A). The United States Court of Appeals for the Third Circuit has jurisdiction over this matter because it is an appeal from an order denying an injunction. See 28 U.S.C. § 1292(a)(1).

## **STATEMENT OF THE ISSUES**

I.      Whether the district court erred by denying Arrowpoint Capital's motion for a preliminary injunction, where it discounted evidence of non-customer confusion in violation of binding Third Circuit precedent, and where the evidence of actual confusion, when properly analyzed under the <u>Lapp</u> test, establishes a likelihood of confusion.

II.     Whether the district court erred as a matter of law by denying Arrowpoint Capital's motions to supplement the record, and thus refusing to consider evidence of actual confusion that occurred during the three years and two months after Arrowpoint Capital's Injunction Motion was fully briefed and awaiting a ruling.

III.    Whether upon remand this case should be reassigned to a different district court Judge, where the present district court Judge's delay created an appearance of impartiality, in that the district court could not have made the finding of irreparable harm necessary for injunctive relief without conceding that, despite its duty to act "with dispatch," the district court had permitted irreparable harm to continue for more than three years.

## STATEMENT OF RELATED CASES

There is one related matter pending before the Trademark Trial and Appeal Board ("TTAB").  In September, 2009, Arrowpoint Capital filed an application with the United States Patent and Trademark Office ("USPTO") to register the word mark ARROWPOINT CAPITAL.  On April 27, 2010, Arrowpoint Asset initiated a proceeding with the TTAB (No. 91194653) opposing registration of the ARROWPOINT CAPITAL word mark.  On September 21, 2010, the TTAB suspended the opposition proceeding pending resolution of the underlying lawsuit. The opposition proceeding remains suspended.

There are no other related cases or proceedings.  This case has not previously been before this Court.

## STATEMENT OF THE CASE

### I.    FACTUAL BACKGROUND

####    A.    Arrowpoint Capital and Its Arrowpoint Marks

Plaintiff/Appellant Arrowpoint Capital is a holding company whose subsidiaries provide insurance- and investment-related financial services throughout the United States.  J.A. 39.  After acquiring the United States insurance operations of Royal & Sun Alliance Insurance Group plc (now known as RSA Insurance Group plc) in 2007, Arrowpoint Capital began managing and investing the assets derived from RSA policy premiums.  J.A. 39.  Arrowpoint Capital's primary source of income is the investment of its reserves in fixed-income securities – investments that provide a return at a predetermined interval and in a predetermined amount.  J.A. 2219–20, 2307–08.

As of March 7, 2011, Arrowpoint Capital had earned more than $1 million for providing investment services to third-party clients and had executed nearly 1,000 trades for them.  J.A. 2221–22, 2228.  Also of March 7, 2011, for its own portfolio, Arrowpoint Capital was managing $2 billion of its own assets and had executed more than 1,200 trades.[1]  J.A. 2220.

Arrowpoint Capital has six trademarks registered with the United States Patent & Trademark Office ("USPTO") featuring "ARROWPOINT," as well as

---

[1]  The information provided about revenue and volume of trades was current as of the completion of briefing on Arrowpoint Capital's Injunction Motion.

one pending application (the "Arrowpoint Marks").  They are:

1.  ARROWPOINT CAPITAL, Reg. No. 3,484,564, for insurance-related services, J.A. 56;

2.  **Arrowpoint Capital** Reg. No. 3,484,563, for insurance-related services, J.A. 57;

3.  ARROWPOINT CAPITAL, Reg. No. 3,948,120, for business auditing services, J.A. 64–69;

4.  **Arrowpoint Capital** Reg. No. 3,948,121, for business auditing services, J.A. 70–75;

5.  **Arrowpoint Capital** Reg. No. 4,132,172, for employee retirement plan administration and consulting services, J.A. 82–87;

6.  ARROWPOINT CAPITAL, Reg. No. 4,132,173, for employee retirement plan administration and consulting services, J.A. 76–81; and

7.  ARROWPOINT CAPITAL, Serial No. 77,836,169, for investment management services, J.A. 95–108.[2]

All of the current and pending registrations for insurance- and investment-related services claim first use in commerce no later than March 4, 2007.[3]

Arrowpoint Capital has marketed its investment-related services through presentations to prospective clients, sponsorships, speaking engagements, attendance at industry conferences, and, to a limited extent, through its website,

---

[2] Regarding Nos. 3–6, the registrations were awarded after completion of briefing of the Injunction Motion.  Regarding No. 7, Arrowpoint Capital applied for this registration and expressly described the investment-related business it has conducted since March 2007.  J.A. 42, 95–108.  In April 2010, Appellees filed an opposition to this application.  The opposition proceeding is suspended pending the outcome of this underlying litigation.

[3]

www.arrowpointcap.com, which it acquired in 2006.  J.A. 251, 279–80, 2708.  As

of March 7, 2011, Arrowpoint Capital had spent at least $390,000 promoting its

services, including investment management services, to third parties.[4]  J.A. 2708.

Through continuous use in commerce and years of marketing efforts, the

Arrowpoint Marks have come to be associated with Arrowpoint Capital and the

investment- and insurance-related services it provides.  J.A. 42.  The Arrowpoint

Marks have acquired substantial and invaluable goodwill, and they distinguish

Arrowpoint Capital's services from those of others.  J.A. 279–80.

B.    Appellees and Their Marks

Defendants/Appellees are an investment management company, two hedge

funds and the hedge funds' general partners.  Arrowpoint Asset was formed by

David Corkins in December 2007 to provide investment fund management and

investment advice, primarily to clients who were contacts of Mr. Corkins.  J.A.

297–98, 307–18, 388, 393, 416.  Before founding Arrowpoint Asset, Mr. Corkins

managed investments for at least eight insurers while employed by Janus.  J.A.

410–13.  Arrowpoint Asset has marketed its services to these and other insurers, to

pension funds, to institutional investors, and to high net worth individuals.  J.A.

418–19, 425–26.

Arrowpoint Asset manages the hedge funds Arrowpoint Fundamental Fund

---

[4]  The information provided about expenditures was current as of the completion of
briefing on Arrowpoint Capital's Injunction Motion.

and Arrowpoint Structured Fund.  J.A. 299–300, 306–07, 321, 333, 396–97.  The general partner of the Arrowpoint Fundamental Fund is Arrowpoint Partners 1. The general partner of the Arrowpoint Structured Fund is Arrowpoint Partners 2.

Like Arrowpoint Capital, Arrowpoint Asset is in the business of purchasing fixed-income securities.  Its Arrowpoint Opportunity Fund opened to investors in March 2009 and invested more than 59% of its assets in fixed-income securities through that year.  J.A. 327, 330–31, 334–35, 505.  Arrowpoint Structured Fund opened to investors in April 2009 and was created for the *sole* purpose of investing in fixed-income securities through the Term Asset-Backed Securities Loan Facility ("TALF") program.[5]  J.A. 322, 325–26, 397–98, 629.  Arrowpoint Structured Fund's investment period closed in 2010, and all of its assets will be returned to investors when the fund closes in 2015.  J.A. 304–05.

Mr. Corkins wanted the Arrowpoint name for his hedge fund because it had "personal significance" to him.  J.A. 2192.  When Mr. Corkins proposed using the name "Arrowpoint," he commissioned his counsel to perform a clearance search for other uses of "Arrowpoint" as a mark.  J.A. 417–18, 724.  That search was completed on November 30, 2007.  J.A. 724.  Based on screening criteria intended to identify "financial services, namely, financial funds management," the search

---

5 The United States Federal Reserve instituted the TALF program to encourage consumer and business lending following the financial crisis of 2008 by issuing nonrecourse loans to holders of certain asset-backed securities. http://www.federalreserve.gov/newsevents/reform_talf.htm.

yielded at least half a dozen separate references to Plaintiff-Appellant Arrowpoint Capital and the Arrowpoint Marks.  J.A. 725–30.

Heedless of the fact that Arrowpoint Capital was already using the Arrowpoint marks for investment-related services, Appellees adopted "Arrowpoint" in various forms for their businesses.  Appellees also adopted a logo featuring an arrow point, .  Appellees' first uses of these marks occurred at least 10 months after Arrowpoint Capital began using its Arrowpoint Marks, and, in some cases, more than two years later.  J.A. 417.  In February 2008, Appellees acquired the domain names "www.arrowpointpartners.com," "www.ap-am.com," and "www.ap-am.net."  They use the "Arrowpoint" name and the arrow point logo, , on these websites.  J.A. 2044–68.

"Arrowpoint" is the dominant element in each of these marks.  Moreover, Appellees refer to their companies as "Arrowpoint" alone in marketing and other materials.  J.A. 400, 402, 405–08, 863, 871, 893–95, 907, 915, 921, 930, 938, 948, 964, 965, 966, 968.

Like Arrowpoint Capital, Appellees have marketed their investment-related services through presentations to prospective clients and speaking and networking at industry conferences.  J.A. 419.  At least two of these events – the 2010 American Securitization Forum and the 2011 ABS East Conference – were attended by representatives of both Arrowpoint Asset and Arrowpoint Capital.

J.A. 251, 262–63, 182–184, 189.    Appellees have promoted their investment management services to at least eight insurance companies, four public pension plans, and three corporate pension plans – precisely the same entities Arrowpoint Capital has targeted for its investment-related services.    Compare J.A. 339–52, 425–26, with J.A. 2220–22.    Appellees deal most extensively with brokers Deutsche Bank Securities, Bank of America Merrill Lynch ("BAML"), Barclays Capital ("Barclays"), Morgan Stanley & Co. ("Morgan Stanley"), and JPMorgan Chase & Co. ("JPMorgan") with regard to fixed-income securities.  J.A. 336, 427–28.    All but one of these institutions also perform fixed-income trades for Arrowpoint Capital.  J.A. 274

Appellees made no effort to register any of their Arrowpoint marks with the USPTO until April 2010, nearly two months after Arrowpoint Capital filed its complaint in this action.  Appellees then filed applications to register their marks for investment management services, including "Arrowpoint Partners" as a word mark and as a design marks (Serial Nos. 85012858 and 85010281, respectively) and "Arrowpoint Asset Management" (Serial No. 85010276).  J.A. 416–17, 732–43.  In July 2010, the USPTO issued initial refusals of these applications based on likelihood of confusion with Arrowpoint Capital's insurance-and investment-related marks.  J.A. 431–55.

C.    Evidence of Actual Confusion

Within a month after the March 2009 launch of Appellees' first hedge fund, Arrowpoint Capital discovered repeated instances of confusion between Arrowpoint Capital and Appellees:

1.  **April 2009:**  A salesperson for the Royal Bank of Scotland ("RBS") contacted Arrowpoint Capital to ask why it used a different broker for a large security purchase identified by the code *******F9, given that Arrowpoint Capital had used the RBS salesperson in the past.  J.A. 250. The purchase at issue had been made by Appellees.  J.A. 364, 745, 753.

2.  **April 2009:**  JPMorgan allocated a securities purchase, identified by the code *******A3, to an Arrowpoint Capital account, when it should have been allocated to an account owned by Appellees.  J.A. 362–63, 745, 753, 759–65.

3.  **May 2009:**  An attorney for Barclays negotiating Arrowpoint Capital's TALF agreement asked whether Arrowpoint Capital was "a different entity from the arrowpoint that is being represented by [T]annenbaum [H]elpern."  J.A. 250–51.  The Tannenbaum Helpern firm never represented Arrowpoint Capital but did represent Appellees in the negotiation of their TALF agreement with Barclays.  J.A. 367.

4.  **June 2009:**  JPMorgan misallocated a securities purchase, identified by the code *******J0, made by Appellees to an Arrowpoint Capital account. J.A. 358–59, 361, 753, 767–73, 788.

5.  **July 2009:**  JPMorgan again misallocated a securities purchase, identified by the code *******L2, made by Appellees to an Arrowpoint Capital account.  J.A. 355–57, 753, 777, 801–08.

6.  **Summer 2009:**  Citigroup, Inc. ("Citigroup") notified Arrowpoint Capital that its application to purchase TALF securities had been delayed due to confusion caused by Appellees' submission of an application for the same securities under the "Arrowpoint" name.  This caused Arrowpoint Capital to lose its position in the queue to acquire the securities.  J.A. 251, 258–60.

7.  **August 2009:**  When Arrowpoint Capital attempted to participate in a corporate bond offering through RBS, it was informed that it would not

11

receive the allocation because it was mistaken for a hedge fund operating out of Colorado – an obvious reference to Appellees.  Eventually, after the confusion was resolved, Arrowpoint Capital received two-thirds of the allocation it initially requested.  J.A. 274.

8. **Fall 2009:**  Morgan Stanley attempted to confirm a change in address from Appellees' address in Denver to Arrowpoint Capital's address in Charlotte.  J.A. 353–54, 813–15.

9. **April 2010:**  Citigroup sent Arrowpoint Capital a general request for information regarding Appellees' Arrowpoint Opportunity Fund and Arrowpoint Structured Fund.  J.A. 817–18.

10. **Summer 2010:**  A JPMorgan salesperson complained that Arrowpoint Capital did not use JPMorgan for a securities purchase.  As it turns out, the purchase was made by Appellees.  J.A. 275, 293–94.

11. **Summer 2010:**  Arrowpoint Capital received numerous calls from employees at Bank of America Merrill Lynch ("BAML") who were confused about whether a trade had been executed by Arrowpoint Capital or by Appellees. As a result of these calls, the bank's salespeople have had to communicate continuously with the trading desk about which "Arrowpoint" is involved in particular transactions.  A BAML employee said one such conversation lasted for approximately an hour because they had to determine which trades had been executed for Arrowpoint Capital and for Appellees, respectively, and which salespeople were covering each entity.  J.A. 274–75, 820–23.

These instances of actual confusion had been discovered by the time briefing was completed on Arrowpoint Capital's Injunction Motion.  On March 15, 2011, Arrowpoint Capital notified the district court that briefing was concluded and requested a hearing.  J.A. 162–63.

During the next 17 months, while Arrowpoint Capital waited for a hearing or a ruling from the district court, it discovered at least nine more instances of actual confusion:

12. **Spring 2011:** An analyst at Morgan Stanley contacted Arrowpoint Capital to request an allocation for a bond trade.  When asked to verify that the trade was for Arrowpoint Capital, the analyst advised that it actually was for "Arrowpoint Asset" and asked whether Arrowpoint Capital was affiliated with Arrowpoint Asset.  J.A. 205.

13. **Summer 2011:**  Arrowpoint Capital was contacted by a representative of Goldman Sachs and asked to confirm and allocate a trade placed by Kaelyn Abrell.  Ms Abrell is employed by Appellees, not by Arrowpoint Capital. J.A. 197–201.

14. **Fall 2011:**  A Barclays representative commented on Arrowpoint Capital's attendance at an upcoming securities conference.  Arrowpoint Capital had not yet signed up to attend.  The Barclays representative explained that she had seen a list of attendees that included "Arrowpoint Partners."  J.A. 182– 184, 189.

15. **Spring 2012:**  While attending a conference, Arrowpoint Capital representatives introduced themselves to two employees of Solamere Advisors, an investment and wealth management firm.  The Solamere Advisors employees said they had heard of Arrowpoint Capital and had looked at the company's "funds" while evaluating funds for clients. Appellees offer "funds;" Arrowpoint Capital never has.  J.A. 191–92.

16. **Spring 2012:** Arrowpoint Capital placed a multi-million dollar order for a new issue bond offered by RBS, Deutsche Bank, and UBS.  Arrowpoint Capital received no allocation in that offering, however, because the syndicate desk handling the transaction had mistakenly believed it was placed by "the Arrowpoint in Colorado," a "fast money" account or a "hedge fund."  Arrowpoint Capital's contact at RBS explained the syndicate desk's mistaken assumption, but by that time there was no way to rectify the mistake.  J.A. 194–95.

17. **Summer 2012:** A Credit Suisse salesperson called Arrowpoint Capital to inquire about a report from his syndicate desk that "Arrowpoint" had placed a multi-million dollar order for a security.  Arrowpoint Capital was not involved in that deal.  J.A. 181–82.

18. **Summer 2012:** A Wells Fargo salesperson asked whether Arrowpoint Capital had placed an order for several million dollars in securities. Arrowpoint Capital had considered but rejected this deal.  Upon

investigating, the salesperson reported that the buyer was "Arrowpoint Asset Management in Denver." J.A. 181.

19. **Summer 2012**: A Morgan Stanley representative contacted Arrowpoint Capital to confirm a multimillion dollar fixed-income trade that had been booked to "Arrowpoint Capital." The representative said the trader was "Kaelyn" at telephone number (303) ***-****. This is the telephone number of Appellees' Denver office, and Kaelyn Abrell is the name of Appellees' trader. J.A. 204.

20. **Summer 2012:** A representative of BAML contacted Arrowpoint Capital by email to inquire about a trade that had been rejected. The email, with the salutation "Team," had two additional addressees, both employed by Appellees. The BAML representative then called Arrowpoint Capital to ask whether it had another entity, because she noticed that the trade said "Arrowpoint Asset Management." She later reported Arrowpoint Asset had confirmed "this was their trade." J.A. 203–04, 208–09.

On August 20, 2012, Arrowpoint Capital filed a motion for leave to supplement the record with these nine additional instances of actual confusion. During the next nine months, while Arrowpoint Capital waited for a hearing or a ruling from the district court on its Injunction Motion and on its First Motion to Supplement, Arrowpoint Capital discovered at least six additional instances of actual confusion:

21. **Fall 2012:** Arrowpoint Capital asked its contact at State Street Bank to provide a list of authorized signers for its bank account. The State Street Bank contact forwarded a list of authorized signers consisting of two pages. The first page listed authorized signatories for Arrowpoint Capital. The second page listed authorized signatories for Appellees. When informed of this error, the State Street Bank contact explained that the information he forwarded had been pulled from an electronic database through a search by name – indicating that the employee searched for "Arrowpoint." J.A. 2736–37, 2741–43.

22. **Fall 2012:**  A RBS manager contacted Arrowpoint Capital about a money difference in a multi-million dollar trade.  Arrowpoint Capital learned that the trade had been made by Appellees, because the customer was identified as "ARROWPOINT ASSET MGMT-GS," and the email address used included "@arrowpointcap.com."  J.A. 2735–36, 2739.

23. **Fall 2012:**  In August 2012, Arrowpoint Capital and Barclays jointly participated in a trial to evaluate a risk management system.  Barclays set up access for Arrowpoint Capital's employees, but mistakenly listed the firm name as "Arrowpoint Asset Management, LLC."  When asked about the mistake, the contact at Barclays responded that he thought Arrowpoint Capital and Arrowpoint Asset were both part of the same entity, which he called "Arrowpoint."  J.A. 2760–64.

24. **Winter 2013:** A Morgan Stanley employee called Arrowpoint Capital to get account details for trades it had allocated to Arrowpoint Capital's account.  Arrowpoint Capital could not identify these trades by the numbers given, so it asked for the name of the trader.  The name provided was that of a trader, Sanjai Bhonsle, employed by one of the Appellees.  The Morgan Stanley employee, upon realizing this, stated that he must have been "confused," and that the trades must have been made by "the other Arrowpoint."  J.A. 2757–58.

25. **Winter 2013:**  A Credit Suisse employee contacted Arrowpoint Capital to ask whether it had submitted orders in a deal in which Wells Fargo or Barclays were other leads.  The employee said his syndicate desk had seen an "Arrowpoint" in the other banks' order books and wanted to know whether this referred to Arrowpoint Capital or "the other entity."  J.A. 2752, 2755.

26. **Winter 2013:**  A Royal Bank of Canada Capital Markets ("RBC") employee contacted Arrowpoint Capital to say he had learned from his syndicate desk that Arrowpoint Capital had placed a multi-million dollar order for an asset-backed security.  Although Arrowpoint Capital had analyzed this offering, it had not yet decided to buy.  The RBC employee later reported that the order actually was placed by an "Arrowpoint" in Denver, and he apologized for the trouble caused by his confusion.  J.A. 2751–52.

27. **Spring 2013:**  A reporter for Creditflux, an independent report on credit trading and investing, contacted Arrowpoint Capital to confirm a tip from

"market sources" that "Arrowpoint" was about to get involved in structured credit by launching a collateral debt obligation, known as a "CLO." Arrowpoint Capital had no such intention. When asked whether he was sure he had the right company, the reporter responded by asking whether he was speaking with "Arrowpoint Capital." Arrowpoint Capital asked the reporter whether he was seeking the Denver-based Arrowpoint Asset Management, and the reporter confirmed that he was indeed looking for "the Denver-based firm." A few weeks later, a *Business Wire* news item reported that Appellees had launched a CLO. The item referred to Appellees' company name as "Arrowpoint" and to the new product as "Arrowpoint CLO 2013-1." J.A. 2745–49.

On April 15, 2013, Arrowpoint Capital filed a motion for leave to supplement the record with these seven additional instances of actual confusion. J.A. 271–32.

In sum, Arrowpoint Capital filed a notice of completion of briefing and request for hearing on its Injunction Motion on March 15, 2011, its First Motion to Supplement on August 20, 2012, and its Second Motion to Supplement on April 15, 2013. At this point, Arrowpoint Capital had discovered 27 instances of actual confusion – 11 by the time briefing on the Injunction Motion was complete and another 16 since then. These are instances of actual confusion between Arrowpoint Capital and Appellees that were reported to Arrowpoint Capital. Arrowpoint Capital has no way to know how many additional instances of actual confusion may have been reported to Appellees or not reported at all.

D.    <u>Damages Resulting from Confusion</u>

The instances of actual confusion outlined above have caused – and continue to cause – irreparable harm to Arrowpoint Capital.  That harm includes loss of goodwill, damage to reputation and relationships with broker-dealers, lost opportunities, denial of trade requests, inability to complete trades, problems with trade settlements, and the loss of substantial time and resources trying to sort through the confusion and repair the damage it causes.  J.A. 288–89.  For example, Arrowpoint Capital lost its place in the queue to purchase TALF-eligible securities from Citigroup as a result of confusion with Appellees.  <u>Supra</u>, instance of confusion No. 6.  As another example, Arrowpoint Capital was told it would receive no allocation in an RBS bond offering due to confusion with Appellees, and only by a great effort dispelling this confusion was Arrowpoint Capital able to get a smaller allocation.  <u>Supra</u>, incident of confusion No. 7.

Arrowpoint Capital's Chief Investment Officer, David Shumway, testified in his deposition about the effects of this actual confusion:

> We have over time very carefully nurtured and managed our street relationships.  You yourself have taken my testimony in terms of my prior time on the street, and the resources that that brings to the company in addition to the way in which we conduct business is very valuable to us.  We get resources that companies our size normally wouldn't get, and we consider that a very important asset, and believe that confusion around who we are as we execute in the marketplace puts us at risk for not maximizing the value of that asset and for other possible issues that would arise that we may not even know occur.

J.A. 289.  He further testified that confusion involving Bank of America and JPMorgan "cost us relationship-wise with our sales coverage [at] that institution." J.A. 290.

Appellees' founder, Mr. Corkins, acknowledged in his own deposition that maintaining good relationships with broker-dealers "helps you perform investment management services" and can affect the allocation that an investment manager receives.  J.A. 399.

Another significant disadvantage to Arrowpoint Capital stems from being confused with the hedge fund investing for which Appellees are known.  J.A. 281. Brokerage firms perceive hedge funds, also known as "fast money accounts," negatively because they often invest only for a short period of time.  J.A. 2224. Arrowpoint Capital tries to avoid this characterization so that it can receive favorable treatment with respect to the size and price of allocations on new bond offerings.  J.A. 2224–25.  Compounding this reputational harm, in at least one instance, one of Appellees' employees responded to Deutsche Bank's confusion by disparaging Arrowpoint Capital, calling it "some stupid firm w/ our same name." J.A. 2641.

The harm to Arrowpoint Capital's commercial interests, goodwill, and reputation from this confusion has continued unabated and will continue absent a preliminary injunction.  J.A. 281, 288–90, 2224–26.

## II.    PROCEDURAL HISTORY

Arrowpoint Capital filed the underlying lawsuit in the United States District Court for the District of Delaware on February 26, 2010.  J.A. 38–54.  Arrowpoint Capital asserted four claims:  (1) trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114; (2) unfair competition and false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) trademark infringement under Delaware common law; and (4) violation of the Delaware Deceptive Trade Practices Act, Del. Code Ann. tit. 6, § 2532.  J.A. 47–52.  The same day, Arrowpoint Capital filed its Injunction Motion seeking to enjoin the Arrowpoint Defendants from using the "Arrowpoint" name or the  logo in any form.  J.A. 113–14.

On October 4, 2010, the district court issued a scheduling order allowing for limited discovery and setting a briefing schedule for the Injunction Motion.  J.A. 130–31.  On March 15, 2011, pursuant to local rules, Arrowpoint Capital, notified the district court that briefing was complete and requested a hearing on its Injunction Motion.  J.A. 162–64.

Seventeen months passed without any ruling.  On August 20, 2012, Arrowpoint Capital filed its First Motion to Supplement.  J.A. 176–78, providing evidence of the nine additional instances of actual confusion that occurred after the

parties completed briefing on the Injunction Motion.  J.A. 176, 180–209; cf. supra, instances of confusion Nos. 12–20.

After nearly eight months more passed without any ruling on the Injunction Motion or the First Motion to Supplement, on April 15, 2013, Arrowpoint Capital filed its Second Motion to Supplement,  J.A. 2721–32,  providing evidence of seven additional instances of actual confusion that occurred after Arrowpoint Capital filed the First Motion to Supplement.  J.A. 2724, 2734–64; cf., supra, instances of confusion Nos. 21–27.

After four months more months passed without a ruling by the district court on the Injunction Motion, the First Motion to Supplement, or the Second Motion to Supplement, and with instances of confusion continuing to arise, Arrowpoint Capital submitted a letter to the district court on August 13, 2013, inquiring about the status of the pending motions.[6]  J.A. 242.  The district court then issued an order, on September 18, 2013, denying the First Motion to Supplement, simply writing the word "Denied" across the face of the proposed order submitted with the motion.  J.A. 2.

---

[6] In light of the district court's February 6, 2009 Standing Order Regarding Telephone Calls to Chambers, which prohibits counsel's contact with chambers, Arrowpoint Capital first contacted the clerk's office before submitting this letter.

Six more months passed without any ruling. On March 25, 2014, the district court issued a one-sentence order denying the Second Motion to Supplement without explanation. J.A. 3.

Finally, on May 20, 2014 – three years and two months after briefing on the Injunction Motion was completed and a hearing requested – the district court issued the Injunction Order, without a hearing and without considering any of the evidence of continuing actual confusion that had occurred since March 15, 2011. J.A. 4–23. On June 17, 2014, Arrowpoint Capital filed a Notice of Appeal. J.A. 1. Arrowpoint Capital appeals the denial of its Injunction Motion and the denial of its two Motions to Supplement. J.A. 1.

## SUMMARY OF THE ARGUMENT

The district court committed legal error in its analysis of whether Arrowpoint Capital established a likelihood of confusion and, therefore, a likelihood of success on the merits of its infringement claims. In direct contravention of this Court's precedent, the district court discounted the evidence of actual confusion submitted by Arrowpoint Capital because the confused parties – the brokers and dealers who handle the investment transactions on which Arrowpoint Capital's business is based – are not Arrowpoint Capital's "customers." This Court has ruled that discounting actual confusion on this basis is an error of law that warrants reversal. See Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 711 (3d Cir. 2004). Analyzing Arrowpoint Capital's evidence of actual confusion, and the other factors set forth by this Court to determine likelihood of confusion under the proper legal standard can support only one conclusion: that Arrowpoint Capital is entitled to a preliminary injunction.

The district court further abused its discretion by denying Arrowpoint Capital's Motions to Supplement. Because actual confusion is the best evidence of likelihood of confusion, courts may not disregard such evidence, Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha, 754 F.2d 591, 597 (5th Cir. 1985), which is "highly probative of the likelihood of confusion" Kos Pharmaceuticals, 369 F.3d at 720. Here, the 16 additional instances of actual confusion were

discovered and submitted for the district court's consideration during the period when the parties had completed briefing of the Injunction Motion and awaited a hearing or decision.    This evidence directly undercut the district court's characterization of the evidence as "isolated and idiosyncratic."  J.A. 17.  By denying the Motions to Supplement, and refusing to consider this evidence of actual confusion, the district court committed error.

Upon remand, this Court should reassign this case to a different judge.  The district court's delay in deciding the Injunction Motion effectively eliminated Arrowpoint Capital's Rule 65 remedy and gave rise to circumstances that would lead a reasonable person to question the district court's impartiality.  This is so because the  court could not have granted injunctive relief without conceding that its delay had permitted irreparable harm to continue unabated for more than three years.  See, e.g., <u>S&R Corp. v. Jiffy Lube Int'l, Inc.,</u> 968 F.2d 371, 378 (3rd Cir. 1992) (trademark infringement results in irreparable harm as a matter of law).

## **ARGUMENT**

## I.   **ARROWPOINT CAPITAL IS ENTITLED TO A PRELIMINARY INJUNCTION.**

A.   Standard of Review.

A district court's denial of a preliminary injunction should be reversed if the court, in denying the motion, committed "an abuse of discretion, an error of law, or a clear mistake in the consideration of proof." American Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994).  But any determination necessary to the issuance of an injunction is reviewed "according to the standard applicable to that particular determination." Id.  The district court's conclusions of law and its application of law to the facts are reviewed de novo, while its findings of fact are reviewed for clear error.  Swartzwelder v. McNeilly, 297 F.3d 228, 234 (3d Cir. 2002); Duraco Prods., Inc. v. Joy Plastic Enters., Ltd., 40 F.3d 1431, 1438 (3d Cir. 1994).  Thus, "[d]espite oft repeated statements that the issuance of a preliminary injunction rests in the discretion of the trial judge[,] whose decisions will be reversed only for 'abuse,' a court of appeals must reverse if the district court has proceeded on the basis of an erroneous view of the applicable law."  Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1242 (3d Cir. 1983); Kos Pharmaceuticals, 369 F.3d at 708.

B.    The district court committed an error of law by discounting Arrowpoint Capital's evidence of non-customer confusion in violation of Third Circuit precedent.

When a plaintiff seeks a preliminary injunction to enjoin trademark infringement under the Lanham Act, the trial court must decide whether the plaintiff can establish a likelihood of confusion under the test set forth in Lapp, 721 F.2d at 463.  The most important Lapp factor is evidence of actual confusion. Country Floors, Inc. v. Gepner, 930 F.2d 1056, 1064 (3d Cir. 1991) (stating that actual confusion usually implies likelihood of confusion); see also Restatement (Third) of Unfair Competition, § 23, cmt. b ("All courts recognize the relevance of proof of actual confusion in determining whether there is a likelihood of confusion, and convincing evidence of substantial actual confusion is ordinarily decisive.").

Here, the district court discounted Arrowpoint Capital's evidence of actual confusion among brokers and dealers because the confusion did not involve customers.  The district court wrote that Arrowpoint Capital "produced no evidence of actual customer confusion." J.A. 16.  And the district court concluded there was no "likelihood of confusion as a matter of law, *especially since the record is devoid of any inference of customer confusion.*" J.A. 17.  By discounting Arrowpoint Capital's evidence of actual confusion in this way, the district court ignored binding Third Circuit precedent and committed an error of law.

The Third Circuit and many other jurisdictions hold that non-customer confusion is actionable and may not be discounted in the analysis of likelihood of confusion.  In Kos Pharmaceuticals, for example, this Court reversed a district court's denial of a motion for preliminary injunction because the district court considered customer confusion – in this case, the confusion of physicians and pharmacists who would dispense the two branded drugs at issue – to the exclusion of all other types of confusion.  369 F.3d at 710–711.  The Court explained that the Lanham Act covers "'the use of trademarks which are likely to cause confusion, mistake, or deception *of any kind*, not merely of purchasers nor simply as to source or origin.'"  Id. at 711 (quoting Syntex Labs., Inc. v. Norwich Pharmacal Co., 437 F.2d 566, 568 (2d Cir.1971)).  The discounting of non-customer confusion was a "fundamental error[] of law that taint[ed] the district court opinion," thus requiring reversal.  Id. at 732.  Under Kos Pharmaceuticals, the discounting of non-customer confusion, by itself, mandates reversal.

Similarly, in Country Floors, 930 F.2d at 1064, this Court gave weight to a variety of non-customer confusion, including: a directory assistance operator giving the wrong party's telephone number to a caller; a supplier sending materials to the wrong party; individuals inquiring about a connection between the two parties; and an interior designer confusing the two parties.  Based on this evidence,

the Court reversed the district court's entry of summary judgment in favor of the infringer.  Id.

Other circuits likewise hold that it is error to discount non-customer confusion.  In reversing a district court's order finding no likelihood of confusion, the Fifth Circuit stated:

> [T]he trial court appears to have believed that only actual confusion on the part of ultimate purchasers was relevant, and for this reason to have discounted the evidence (and its own findings) of actual confusion on the part of distributors and trade show visitors. This was error.

Fuji Photo Film, 754 F.2d at 597; see also Mid-State Aftermarket Body Parts v. MQVP, Inc., 466 F.3d 630, 634 (8th Cir. 2006) (ruling that confusion that will harm a company's business is actionable even though not among consumers); Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp., 376 F.3d 8, 16 (1st Cir. 2004) (finding that the likelihood of confusion inquiry is not limited to actual or potential purchasers, but includes others whose confusion threatens the trademark owner's commercial interest in its mark); Ferrari S.P.A. v. Roberts, 944 F.2d 1235, 1245 (6th Cir. 1991) ("[E]vidence of actual confusion is not limited to purchasers."); Grand Heritage Mgmt., LLC v. Murphy, No. 06CIV.5977NRB, 2007 WL 3355380, at *7 (S.D.N.Y. Nov. 7, 2007) (explaining that the Lanham Act is designed to prevent confusion "among 'not only potential purchasers but also the general public'" (citation omitted)).

In an analogous case involving the financial services industry, the Second Circuit reversed the dismissal of a Lanham Act claim and remanded for entry of a permanent injunction after finding that the district court discounted evidence of confusion by relying "on an inordinately narrow definition of actual confusion." Morningside Grp. v. Morningside Capital Grp., 182 F.3d 133, 141 (2d Cir. 1999). That case, like this one, involved parties providing investment services under marks that each featured the same dominant element (there, "Morningside").  In that case, as in this one, the plaintiff offered evidence of actual confusion in the form of "phone calls and other inquiries received by its people from sophisticated members of the financial community, both about . . . transactions and about the relationship between the two entities." Id. at 141.  The Second Circuit concluded such evidence of confusion regarding affiliation or sponsorship is "entirely relevant to the ultimate likelihood of confusion inquiry." Id.

The Sixth Circuit, in another analogous case, held that potential confusion among non-purchasers is just as significant as that among purchasers.  Champions Golf Club, Inc. v. Champions Golf Club, Inc., 78 F.3d 1111, 1119–20 (6th Cir. 1996).  That case involved two private, members-only golf clubs using the same name.  Id. at 1115.  At a bench trial, the district court disregarded evidence of actual confusion by a logo designer, a different athletic club, a golf ball manufacturer, and a golf tournament volunteer because none of these individuals

were purchasers.  Id. at 1119.  The Sixth Circuit vacated the judgment in favor of the infringer and remanded, directing the district court to reconsider the evidence of actual confusion, "bearing in mind that it is not determinative of the matter that the four incidents of actual confusion did not relate to direct consumers of [the plaintiff's] services."  Id. at 1120.  "It is significant," the court instructed, "that in all four instances, the confused individuals were knowledgeable about golf clubs, and had an incentive to accurately identify the club in question, but nonetheless were unclear about which club was which."  Id.

As these authorities show, it was clear error for the district court to discount Arrowpoint Capital's evidence of non-customer confusion.  By the time the parties completed briefing on the Injunction Motion, Arrowpoint Capital had presented to the district court evidence of 11 instances of actual confusion.  Supra, at 11–13.  These instances of actual confusion are precisely the type of confusion  this Court and other courts have found relevant and persuasive.

In Morningside Group, for example, the Second Circuit found relevant the fact that members of the financial community had merely inquired to the plaintiff about the infringers' transactions and the relationship between the parties.  182 F.3d at 141; see also Country Floors, 930 F.2d at 1064 (considering confusion of vendors and inquiries about affiliation).  Here, representatives from RBS, JPMorgan, and BAML asked Arrowpoint Capital about the Appellees'

transactions.  Supra, instances of confusion Nos. 1, 10, 11.  And representatives from Barclays, Morgan Stanley, and Citigroup asked Arrowpoint Capital about its relationship with Appellees and, in some instances, asked for information about Appellees' business.  Supra, instances of confusion Nos. 3, 8, 9.

The Morningside Group court found particularly relevant the relationship injury arising from misunderstandings in the investment community:

> High-level investment business is commonly conducted based on trust and personal relationships among individuals.  If any investor reads about a Morningside Capital investment . . . and mistakes that transaction for a Morningside Group investment of which it was not aware, it may well feel "cut out" of a potentially lucrative deal.

Morningside Grp., 182 F.3d at 140.  This is exactly the situation that Arrowpoint Capital faced when representatives of RBS and Barclays complained that Arrowpoint Capital had not used their respective companies for securities purchases, when in fact it was Appellees that made those purchases.  Supra, instances of confusion Nos. 1, 10.

The confusion in this case is also similar to the confusion in Champions Golf Club, in which individuals "were knowledgeable about golf clubs, and had an incentive to accurately identify the club in question, but nonetheless were unclear about which club was which."  78 F.3d at 1120.  In this case, brokers and dealers knowledgeable about investment transactions, with an incentive to accurately identify the prospective purchaser in question, were nonetheless unclear about

30

which "Arrowpoint" was which, resulting in the misallocation of trades to the wrong "Arrowpoint," supra, instances of confusion Nos. 2, 4, 5; in recurring, time-consuming efforts to determine which trades had been executed for which "Arrowpoint," supra, instance of confusion No. 11; and in denial and delay of trades to Arrowpoint Capital because it was mistaken for the other "Arrowpoint," supra, instances of confusion Nos. 6, 7.

These instances of confusion undeniably harmed Arrowpoint Capital's business interests – precisely the type of harm held actionable by the Eighth Circuit in MQVP, 466 F.3d at 634, and the First Circuit in Beacon, 376 F.3d at 16, even though the confusion was not among customers.

These 11 instances of confusion are more than enough to prove likelihood of confusion.  See, e.g., Morningside Grp., 182 F.3d at 143 (where "some members of the sophisticated market in which the parties operate have already been actually confused, it cannot be gainsaid that others in the same market are likely to be confused").

The 16 additional instances of confusion discovered during the three years and two months while Arrowpoint Capital's Injunction Motion was pending show that the actual confusion persists over time and comes from an even wider variety of sources.  Supra, instances of confusion Nos. 12–27.  These ongoing instances of confusion, which the district court erroneously refused to consider, infra, Part II,

involved a bank mistakenly releasing one party's account signatory information to the other party, <u>supra</u>, instance of confusion No. 21; business reporters mistakenly calling one company seeking information about the other company's investment products, <u>supra</u>, instance of confusion No. 27; and still further instances of trading desk personnel confusing one "Arrowpoint" with the other, resulting in misallocated securities purchases, delayed trades, reduced allocations, and opportunities to participate in deals being lost all together, <u>supra</u>, instances of confusion Nos. 12–13, 16–20, 22, 24, 26.

Arrowpoint Capital learned of all of these instances of confusion not through its own initiative, but purely by happenstance, when the confused parties contacted the company. Arrowpoint Capital has no doubt that additional confusion exists but is simply not known to the company. <u>Cf. Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.</u>, 269 F.3d 270, 291 (3d Cir. 2001) ("[I]t is difficult to find evidence of actual confusion because many instances are unreported."). Here, the district court committed reversible error by discounting Arrowpoint Capital's evidence of non-customer confusion. This evidence, when properly considered, establishes a strong likelihood of confusion.

C.    <u>This Court should grant a Preliminary Injunction rather than remand to the district court for additional factual determinations.</u>

"Although a district court's application of an incorrect legal standard 'would normally result in a remand, [the appellate court] need not remand' if application

of the correct standard could support only one conclusion." <u>Kos Pharmaceuticals</u>, 369 F.3d at 712.  Here, Arrowpoint Capital's evidence of actual confusion is so compelling – and the other relevant <u>Lapp</u> factors weigh so strongly in favor of Arrowpoint Capital – that this Court should mandate entry of a preliminary injunction enjoining Appellees' further infringement of the Arrowpoint Marks.

A litigant seeking a preliminary injunction must show that: (1) it is likely to succeed on the merits of its claims; (2) it is likely to suffer irreparable harm absent preliminary relief; (3) granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) an injunction is in the public interest.  <u>Kos Pharmaceuticals</u>, 369 F.3d at 708.  Arrowpoint Capital satisfies each element of this standard.

> 1. *Arrowpoint Capital is likely to succeed on the merits of its Lanham Act claims.*

To prove trademark infringement under Section 32 of the Lanham Act or Unfair Competition under Section 43(a)the Lanham Act, a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of a similar or identical mark creates a likelihood of confusion.  <u>See</u> 15 U.S.C. §§ 1114(1)(a); 1125(a)(1); <u>Checkpoint</u>, 269 F.3d at 279.  The test is the same for common law trademark infringement and violation of the Delaware Deceptive Trade Practices Act.  <u>See</u> <u>Draper Commc'ns, Inc. v. Delaware Valley Broadcasters Ltd. P'ship</u>, 505 A.2d 1283, 1289–90 (Del. Ch.

1985) (setting forth the common law elements); Del. Code Ann. tit. 6, § 2532(a) (setting forth the statutory elements).

The district court correctly ruled that Arrowpoint Capital owned a valid and legally protectable mark.  J.A. 10–11.  To determine whether there is a likelihood of confusion, this jurisdiction employs the Lapp test, which involves the following non-exhaustive list of factors:

(1)     the degree of similarity between the owner's mark and the alleged infringing mark;

(2)     the strength of the owner's mark;

(3)     the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4)     the length of time the defendant has used the mark without evidence of actual confusion arising;

(5)     the intent of the defendant in adopting the mark;

(6)     the evidence of actual confusion;

(7)     whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

(8)     the extent to which the targets of the parties' sales efforts are the same;

(9)     the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

(10)     other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

Lapp, 721 F.2d at 463.

Each of these <u>Lapp</u> factors may be weighted differently depending on the facts of a case.  <u>Fisons Horticulture, Inc. v. Vogoro Indus., Inc.</u>, 30 F.3d 466, 476 (3d Cir. 1994).  But because actual confusion is the best evidence of likelihood of confusion, <u>Fuji Photo Film</u>, 754 F.2d at 597, little proof of actual confusion is needed to prove likelihood of confusion.  <u>World Carpets, Inc. v. Dick Littrell's New World Carpets</u>, 438 F.2d 482, 489 (5th Cir. 1971).  Moreover, "an almost overwhelming amount of proof" would be required to overcome evidence of actual confusion.  <u>Id.</u>; <u>see also</u> Restatement (Third) of Unfair Competition, § 23, cmt. b.

In this case, the evidence of actual confusion is so significant that it would indeed take an "overwhelming amount of proof" to preclude entry of a preliminary injunction.  But even beyond that, the remaining <u>Lapp</u> factors, when analyzed as the law requires, also show there is a likelihood of confusion that justifies the entry of a preliminary injunction.

a.  <u>The parties' respective marks are similar (Lapp factor one).</u>

The dominant feature of each party's marks – "Arrowpoint," – is identical in spelling and sound.  Appellees' own employees perceive the two companies' marks as identical, referring to Arrowpoint Capital as "[s]ome stupid firm w/ our same name."  J.A. 2641.  Appellees' own promotional materials and their officers' testimony show that they frequently go by "Arrowpoint" alone.  J.A. 400, 402,

405–08, 863, 871, 893–95, 907, 915, 921, 930, 938, 948, 964–65, 966, 968. Appellees concede that "Arrowpoint" is their "brand name."  J.A. 2171.

In any event, because the dominant feature of the respective marks, "Arrowpoint," is identical, "confusion is likely."  Country Floors, 930 F.2d at 1065; see also Checkpoint, 269 F.3d at 281 (finding that when the dominant portions to the two marks are the same "it is very probable that the marks are confusingly similar").

A junior user cannot avoid a likelihood of confusion by adding descriptive terms to the dominant feature of the senior user's mark.  Checkpoint, 269, F.3d at 281–82; The descriptive terms added are even similar from one "Arrowpoint" to the other – for example, "Arrowpoint Capital" and "Arrowpoint Asset" convey the same impression.  Indeed, there are multiple examples of confusion occurring notwithstanding the use of the word, "Asset".  Supra, instances of confusion Nos. 12, 14, 20, 22–23.

The district court's finding that this factor only "slightly" favors Arrowpoint Capital is contradicted by the evidence.  Moreover, the district court's analysis was colored by the importance it placed on consumer confusion to the exclusion of all other kinds of confusion.  For example, the district court found that "very similar marks are able to coexist in the financial services market, where consumers take greater care than many others, when the parties use their full names in 'official'

communications." J.A 14–15 (citing <u>First Keystone Fed. Sav. Bank Life Ins. Co. of Mass. V. SBLI USA Mut. Life Ins. Co.</u>, C.A. No. 00-3255, 2000 U.S. Dist. LEXIS 17178, at *49 (E.D. Pa. Nov. 29, 2000).

This ignores the evidence of actual confusion here, which does not concern consumers, but instead concerns, for the most part, employees of the world's most sophisticated financial institutions, who are highly motivated to "get it right," yet are still confused. This may be because in the rapid-fire world of securities trades, the formalities of full names are a rarity, and the dominant feature – in the case of both parties, "Arrowpoint" – is the only part of the mark that is used. For these reasons, the district court erred in finding that this <u>Lapp</u> factor only slightly favors Arrowpoint Capital – instead, it strongly favors Arrowpoint Capital.

      b. <u>Arrowpoint Capital's Mark is strong (Lapp factor two).</u>

Arrowpoint Capital's Arrowpoint Marks are arbitrary as applied to the services that the company provides, and thus its marks are inherently strong and distinctive, as Appellees concede. J.A. 11; see <u>Morningside Grp.</u>, 182 F.3d at 139 ("When a mark has been deemed arbitrary, . . . its very arbitrariness is an indicium of strength.") Moreover, the mark's strength is examined "principally in the market in which the mark is used." <u>Id.</u> In <u>Morningside Group</u>, as in this case, the relevant market is "the relatively small world of financial investment professionals." <u>Id.</u>

The district court ignored this legal principle and viewed this factor, once again, through the lens of consumer confusion alone, finding that the marks' "conceptual strength is undermined by the lack of evidence demonstrating commercial strength," because it is unclear whether the sums spent on promotional efforts are "sufficient to establish marketplace recognition for investment management services."    The district court ignored unrefuted evidence of the strength of the Arrowpoint Marks among the financial institutions with whom Arrowpoint Capital conducts trades.    For example, Arrowpoint Capital's Chief Investment Officer testified during his deposition that:

> We have over time very carefully nurtured and managed our street relationships….    We get resources that companies our size normally wouldn't get, and we consider that a very important asset, and believe that confusion around who we are as we execute in the marketplace puts us at risk for not maximizing the value of that asset….

J.A. 289.

Given that the ARROWPOINT Mark is arbitrary in connection with insurance- and investment-related services, and has strong recognition among the financial institutions with which it does business, this factor is not neutral, as the district court found, but instead strongly favors Arrowpoint Capital.

       c. <u>Consumer care and sophistication are high (Lapp factor three).</u>

Consumers of the parties' investment services are likely to be careful and sophisticated. But the large number of instances of actual confusion experienced among the most sophisticated of financial institutions shows that this sophistication does not mitigate the likelihood of confusion. And when sophisticated individuals are actually confused, this factor should not favor the infringer. In <u>Champions Golf Club</u>, 78 F.3d at 1120, the court found it "significant" that vendors knowledgeable about golf clubs and motivated to accurately identify the club in question were nonetheless confused. And in <u>Morningside Group</u>, 182 F.3d at 142–143, the Second Circuit held that the district court erred when it "woodenly applied the general rule that likelihood of confusion is diminished when potential purchasers are sophisticated." The court wrote that even in a small and highly sophisticated market, when "there is a high degree of similarity between the parties' services and marks, 'the sophistication of the buyers cannot be relied on to prevent confusion.'" <u>Id.</u> at 143 (citations omitted).

Thus, this factor does not strongly favor Appellees, as the district court found. Instead, it is either neutral or, under <u>Champions Golf Club</u> and <u>Morningside</u>, favors Arrowpoint Capital.

     d. <u>Actual confusion occurred almost immediately (Lapp factor four).</u>

Arrowpoint Capital discovered the first instance of actual confusion resulting from Appellees' infringement less than one month after Appellees began investing in earnest through their first hedge fund, the Arrowpoint Fundamental Fund, which opened to investors in March 2009.  J.A. 327.  The Arrowpoint Structured Fund opened to investors in April 2009.  J.A. 629.

Arrowpoint Capital then discovered two instances of actual confusion involving trades in April 2009.  In one case, an RBS salesperson asked Arrowpoint Capital why it did not use RBS to broker a particular trade.  <u>Supra</u>, instance of confusion No. 1.  In another case, JPMorgan misallocated one of Appellees' purchases to an Arrowpoint Capital account.  <u>Supra</u>, instance of confusion No. 2.  A third instance of confusion was discovered in May 2009, when an attorney for Barclay's who was negotiating Arrowpoint Capital's TALF agreement asked whether Arrowpoint Capital was "a different entity from the arrowpoint that is being represented by [T]annenbaum [H]elpern" – the firm that represented Appellees in the negotiation of their TALF agreement with Barclays but never represented Arrowpoint Capital.  <u>Supra</u>, instance of confusion No. 3.

The district court stated that it could not assess this factor given "the nature of the alleged 'actual confusion' and the lack of evidence regarding the amount and type of trades the parties executed."  J.A. 19.  But Arrowpoint Capital provided

detailed information about the amount of trades it executed and about the nature of its trades.  See, e.g., J.A. 2220–22; 2228.

In any event, given the timing of Appellees' launch of their hedge funds and the timing of these documented instances of actual confusion, this factor is not neutral, as the court suggests, but instead strongly favors Arrowpoint Capital.

> e. Appellees knew about Arrowpoint Capital before adopting "Arrowpoint" as a mark (Lapp factor five).

Appellees knew about Arrowpoint Capital from their trademark search report.  J.A. 723–30.  Appellees also knew that Arrowpoint Capital was an active investor because Appellees promote their services to insurance companies.  J.A. 425.  And Appellees' founder, Mr. Corkins, must have known that Arrowpoint Capital was an active investor given his experience managing assets for at least eight insurance companies.  J.A. 410–12.  Courts have inferred wrongful intent from this knowledge alone.  See, e.g., Wynn Oil Co. v. Am. Way Serv. Corp., 943 F.2d 595, 603 (6th Cir. 1991) ("Understandably, courts have held that use of a mark with knowledge of another's prior use of the mark supports an inference of intentional infringement.").  Appellees' clearance search was completed in November 2007.  J.A. 725.  Based on services identified as "financial services, namely, financial funds management," this search yielded six separate references to Arrowpoint Capital.  J.A. 725–30.  Appellees chose to disregard this evidence of Arrowpoint Capital's prior rights in the Arrowpoint Marks.

Despite their purported "clearance" of their use of "Arrowpoint," and despite the significance that the "Arrowpoint" marks held for Mr. Corkins, J.A. 2192, Appellees made no effort to register any of their Arrowpoint marks with the USPTO until April 2010, nearly two months after Arrowpoint Capital's complaint in this action was filed. They then filed applications to register the marks for investment management services. J.A. 416–17. In short order, in July 2010, the USPTO issued initial refusals of these applications based on a likelihood of confusion with Arrowpoint Capital's earlier-filed applications. J.A. 431–55.

Even if Appellees did not intentionally chose their mark to promote confusion, their lack of care in investigating and evaluating their proposed Arrowpoint marks is "highly relevant." Kos Pharmaceuticals, 369 F.3d at 721; see also Sanofi-Aventis v. Advancis Pharm. Corp., 453 F. Supp. 2d 834, 852 (D. Del. 2006) (stating that the defendant's negligence in selecting and investigating its name weighed in plaintiff's favor).

The district court ignored the evidence showing that Appellees were aware of the connection between Arrowpoint Capital and "financial services, namely, financial funds management," ignored Mr. Corkins' admitted familiarity with the investment aspects of insurance, and simply accepted Appellees' argument that its clearance search indicated Arrowpoint Capital was engaged in property and casualty insurance, not investment management or related services. J.A. 19.

Accordingly, the court found that this intent factor favors Appellees. This finding is not supported by the evidence, which shows instead that this factor favors Arrowpoint Capital.

        f.   <u>Arrowpoint Capital and Appellees market their services through the same trade channels (Lapp factor seven).</u>

Arrowpoint Capital and Appellees both market their services through direct client presentations and networking at investment industry conferences and events. They each had representatives at the 2010 American Securitization Forum, J.A. 251, 262–63, and at the 2011 ABS East Conference, <u>supra</u>, instance of confusion No. 14. <u>See</u> <u>Acxiom Corp. v. Axiom, Inc.</u>, 27 F. Supp. 2d 478, 497 (D. Del. 1998) (recognizing a likelihood of confusion among sophisticated purchasers because both parties' marketing included "participation at industry trade shows and conferences"). The district court ignored these similarities and focused instead on the statement by Arrowpoint Capital that it does not attend events targeted specifically at hedge fund investors "because it is not a hedge fund." J.A. 20. The court also emphasized that Appellees rely on word-of-mouth referrals, "which intuitively eliminate the possibility of confusion," and that the parties make direct client presentations incorporating their respective logos, "which are visually distinct." J.A. 19–21. This conclusory reasoning is wholly unsupported by the evidence.

The evidence shows multiple instances of confusion that occurred through

use of the same trade channels. In addition to the parties' attendance at the conferences cited above, another instance of confusion occurred at a presentation of the CFA North Carolina Society in Spring 2012. <u>Supra</u>, instance of confusion No. 15. Moreover, this analysis again looks at the likelihood of confusion only through the lens of consumer confusion. Given this evidence of actual confusion, beyond the realm of consumer confusion, the channels-of-trade factor favors Arrowpoint Capital.

> g. <u>Arrowpoint Capital and Appellees target the same prospects, and their investment services are similar (Lapp factors eight and nine).</u>

Appellees have promoted their investment management services to at least eight insurance companies, four public pension plans, and three corporate pension plans – precisely the same entities Arrowpoint Capital has targeted for its investment-related services. J.A. 425-26, 339–52. More importantly, Arrowpoint Capital and Appellees each compete to participate in the same issuances of fixed income securities, such as TALF. Several instances of actual confusion arose in connection with that participation. <u>See, e.g.</u>, <u>supra</u>, instance of confusion No. 6. Even beyond TALF, they have participated in many of the same types of transactions and, in some cases, the very same transactions. <u>See, e.g.</u>, <u>supra</u>, instance of confusion No. 27.

The district court acknowledged, as Appellees' conceded, that insurance companies and pension funds are potential clients for both parties." J.A. 20. But the court drew a distinction between the services these clients would want from each party, finding that clients would turn to Arrowpoint Capital for expertise in fixed-income securities and to Appellees for "expertise across the capital spectrum." J.A. 20. The court found that "while some potential customers may overlap, there is little likelihood of consumer confusion because the parties offer distinctly different investment management strategies to generally different classes of customers." J.A. 20. Thus, the court concluded, these factors favor Appellees. J.A. 21.

This analysis is flawed in at least two respects. First, there is no legal precedent for the conclusion that if the parties each serve the same clients with the same services, there is no likelihood of confusion as long as the alleged infringer provides other services beyond the subset of those that overlap (here, fixed-income securities). The record shows that Appellees are heavily involved in fixed-income securities, and confusion between Arrowpoint Capital and Appellees has occurred frequently in that area. That actual confusion – the best evidence of likelihood of confusion – is not negated by the fact that Appellees also provide services in other areas.

Secondly, the district court erred in once again analyzing these factors only through the lens of consumer confusion. The court rejected Arrowpoint Capital's focus on the parties' overlapping investment activity at various brokerage firms, which has led to actual confusion, and instead based its conclusion on finding that "there is little likelihood of customer confusion because the parties offer distinctly different investment management strategies to generally different classes of investors." J.A. 21. When these factors are properly weighed, they favor Arrowpoint Capital, not Appellees.

The district court concluded its analysis of the Lapp factors by stating that Arrowpoint Capital's evidence of "broker-dealer confusion" was not dispositive of a likelihood of confusion "*in the marketplace*." J.A. 22 (emphasis added). Thus, the court ruled, Arrowpoint Capital failed to prove likelihood of success on the merits of its Lanham Act claims because it "has not shown likelihood of confusion *in the marketplace*." (emphasis added). This conclusion shows the district court's fundamental error: that the types of confusion relevant to a showing of likelihood of confusion extend beyond consumers and the marketplace. And the types of confusion Arrowpoint Capital has shown prove a likelihood of confusion.

Thus, having shown that Arrowpoint Capital owns the Arrowpoint Marks, that the marks are valid and legally protectable, and that Appellees' uses of "Arrowpoint" are likely to cause, and indeed have caused, confusion that is

actionable under the Lanham Act, Arrowpoint Capital is likely to succeed on the merits of its infringement claim.

 2.  *Arrowpoint Capital Will Suffer Irreparable Harm Without an Injunction.*

As shown by the 27 known instances of actual confusion spanning the years since 2009 and continuing to date, Arrowpoint Capital has suffered, and will continue to suffer, irreparable harm unless Appellees are enjoined from using their Arrowpoint marks.  "Irreparable injury does not require diversion of actual sales and it can include the loss of control of reputation, loss of trade, and loss of goodwill." W.L. Gore & Assocs., Inc. v. Totes, Inc., 788 F.Supp 800, 810 (D. Del. 1992).  Specifically, "[l]ack of control over one's mark 'creates the potential for damage to . . . reputation[, which] constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case.'" Kos Pharmaceuticals, 369 F.3d at 727 (quoting Opticians, 920 F.2d at 196).  A plaintiff can prove irreparable harm by showing "a significant risk that [it] will experience harm that cannot adequately be compensated after the fact by money damages." Adams v. Freedom Forge Corp., 204 F.3d 475, 484–85 (3d Cir. 2000).

In the Third Circuit, if a Lanham Act plaintiff can prove infringement, irreparable injury follows as a matter of law.  S&R Corp., 968 F.2d at 378. Likewise, under Delaware law, "[i]f likelihood of confusion is shown, an injunction will issue without any need to show any actual loss, or diversion of the

plaintiff's business, or intent on the part of the defendant to inflict injury or damage." <u>Draper</u>, 505 A.2d at 1290.

In this case, Arrowpoint Capital has made the strongest possible showing of likelihood of confusion – actual confusion. <u>See</u> <u>Sabinsa Corp.</u>, 609 F.3d 175, 187 (3d Cir. 2010) (stating evidence of actual confusion is "highly probative of a likelihood of confusion"). With this showing, "irreparable injury follows as a matter of course." <u>Opticians</u>, 920 F.2d at 196.

Arrowpoint Capital has had trades delayed or denied, has had relationships with brokers and dealers strained, has been confused with Appellees by a host of parties, ranging from bankers releasing account signatory information in error to account representatives changing addresses in error, to reporters calling about stories in error. The confusion resulting from Appellees' infringement has also caused Arrowpoint Capital economic loss and prevented it from completing trades as scheduled, thus hurting its ability to do business.

Appellees' infringement will continue unless enjoined by this Court. Thus, an injunction is necessary to prevent Arrowpoint Capital from suffering further irreparable harm.

> 3. *The Balance of the Equities Tips in Arrowpoint Capital's Favor.*

Before granting an injunction, a court must balance "the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the

defendant if the injunction is issued." Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 596 (3d Cir. 2002). The harm to Arrowpoint Capital if an injunction does not issue would be substantial and irreparable. As Arrowpoint Capital's Chief Investment Officer, David Shumway, testified at his deposition, through years of carefully nurturing and managing its relationships with brokers and dealers, the company "gets resources that companies our size normally wouldn't get." As Mr. Shumway explains, that is a valuable asset. J.A. 289.

Appellees, on the other hand, built their client base on David Corkins' contacts from personal or professional connections J.A. 308–17, – investors who are likely to invest with Appellees regardless of whether they market their services under the "Arrowpoint" name. Moreover, one of Appellees' primary investment vehicles, Arrowpoint Structured Fund, is already closed to new investors, and all of its assets will be returned to investors by 2015.

Appellees, moreover, chose their mark knowing full well that Arrowpoint Capital was already using its Arrowpoint Marks. Even though Arrowpoint Capital appeared at least half a dozen times in the clearance report ordered by Appellees' counsel, Appellees proceeded to adopt their "Arrowpoint" marks anyway. J.A. 725–30. Undoubtedly mindful of the need to "fly under the radar," Appellees made no attempt to register their marks with the USPTO until well after the filing

of the complaint in this litigation, J.A. 416–17, and then they promptly drew an initial refusal to register based on a likelihood of confusion with Arrowpoint Captial's Arrowpoint Marks, J.A. 732–43.

In sum, the balance of equities tips in Arrowpoint Capital's favor, and this Court should grant an injunction prohibiting any further infringement of the Arrowpoint Marks by Appellees.

### 4.    An Injunction Is in the Public Interest.

Enjoining the wrongful trademark uses by Appellees that have led to the actual deception and confusion shown here is in the public interest, particularly given Arrowpoint Capital's strong showing of likelihood of success on the merits and irreparable injury.

The Court must assess the public interest in whether an injunction should issue.  See Opticians, 920 F.2d at 191–92.  While the "public interest" can be defined in a number of ways, "in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused." Id. at 197.  "'As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff.'"  Kos Pharmaceuticals, 369 F.3d at 729 (quoting American Tel. & Tel., 42 F.3d at 1427 n.8 (3d Cir. 1994)).

Arrowpoint Capital has shown that it is likely to succeed on the merits of its trademark infringement claims.  In addition, Arrowpoint Capital has shown that Appellees' uses of their Arrowpoint marks have caused and will continue to cause confusion.  Thus, the public interest strongly favors granting an injunction prohibiting further infringement of the Arrowpoint Marks by Appellees.

## II.    THE DISTRICT COURT ERRED BY DENYING ARROWPOINT CAPITAL'S MOTIONS TO SUPPLEMENT THE RECORD WITH ADDITIONAL EVIDENCE OF ACTUAL CONFUSION.

### A.    Standard of Review.

A district court's denial of a motion to supplement the record with additional evidence should be reversed if the court committed an abuse of discretion.  See Garcia v. Newtown Twp., 483 F. App'x 697, 705 n.25 (3d Cir. 2012).  An abuse of discretion is a clear error of judgment.  Reedy v. Borough of Collingswood, 204 F. App'x 110, 113 (3d Cir. 2006).  For example, where the district court's decision rests upon an erroneous conclusion of law, In re Baby Prods. Antitrust Litig., 708 F.3d 163, 175 (3d Cir. 2013), or where the district court's decision is arbitrary, fanciful, or clearly unreasonable, Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 211 (3d Cir. 2009), an abuse of discretion has occurred, and the district court's decision must be reversed.

B.    <u>The district court was required to consider Arrowpoint Capital's evidence of actual confusion, and its failure to do so constitutes an abuse of discretion.</u>

When considering whether there is a likelihood of confusion, the trial court must consider evidence of actual confusion.  As the Fifth Circuit wrote, "there is simply no precedent" for the "total disregard of evidence of actual confusion." <u>Fuji Photo Film</u>, 754 F.2d at 597; <u>see also</u> 4 <u>McCarthy on Trademarks and Unfair Competition</u> § 23:13 (4th ed.) ("No matter how convinced a trial judge may be of the absence of any likelihood of confusion, he or she must at least listen to evidence presented of actual confusion.").  This is so because actual confusion is the best evidence of likelihood of confusion.  <u>Fuji Photo Film</u>, 754 F.2d at 597.  Thus, the Tenth Circuit reversed a lower court's decision refusing to hear testimony of actually confused individuals on the grounds that that evidence "would [not] make any difference."  <u>Frito-Lay, Inc. v. Morton Foods, Inc.</u>, 316 F.2d 298, 301 (10th Cir. 1963).  The Court's subjective comparison of the marks "cannot conclusively negative the likelihood of confusion as a matter of law nor can it negative confusion as a matter of fact by the expedient of technically accepting the offered proof but summarily rejecting its weight or credibility."  <u>Id.</u> The district court's failure to follow this precedent was an error of law, which requires reversal under the abuse of discretion standard.  <u>See</u> <u>In re Baby Prods.</u>, 708 F.3d at 175.

The district court's denials of the Motions to Supplement were also an abuse of discretion under the "clearly unreasonable" standard, see Acumed, 561 F.3d at 211, because the additional evidence directly impacts the weighing of the Lapp factors.  For example, the district court discounted Arrowpoint Capital's evidence of actual confusion as "isolated and idiosyncratic."  J.A.  17.  Yet the additional evidence shows that actual confusion was persistent and pervasive.

The District Court also determined that it was "unable to thoroughly assess" the length of time Arrowpoint Asset used the Arrowpoint mark without evidence of actual confusion arising.  J.A. 18–19.  The evidence of confusion submitted with the initial briefing showed that actual confusion occurred almost immediately after Appellees launched their hedge funds in 2009.  Supra, instances of confusion Nos. 1, 2, 3.  The evidence that Arrowpoint Capital tendered to the district court during the years while it waited for a ruling or a hearing showed that the instances of confusion continued, unabated, over time.  Supra, instances of confusion Nos. 12–27.

Finally, the district court concluded the "channels of trade and advertising media" factor "strongly favors" Appellees.  J.A. 19–20.  Yet the Motions to Supplement presented two examples of actual confusion resulting from the parties' attendance at marketing events.  J.A. 182, 191–92.  It was "clearly unreasonable"

for the district court to refuse to consider evidence that could affect the outcome of the Injunction Motion.  See <u>Acumed</u>, 561 F.3d at 211.

Arrowpoint Capital's Motions to Supplement were timely.  Arrowpoint Capital disclosed the new evidence to defendants before filing the Motions to Supplement.  J.A. 165, 218, 219.  Every instance of actual confusion included in the First Motion to Supplement occurred during the 17 months after the parties completed briefing on the Injunction Motion.  J.A. 165.  And every instance of actual confusion included in the Second Motion to Supplement occurred during the eight months after Arrowpoint Capital filed the First Motion to Supplement.  J.A. 177.  The need to submit additional evidence of actual confusion therefore resulted from the district court's delay in issuing a ruling, not from any undue neglect by Arrowpoint Capital.  Given the timely nature of Arrowpoint Capital's requests, the district court's ruling – which provided no reasons for denying the Motions to Supplement – was "arbitrary," which constitutes an abuse of discretion.  See <u>Acumed</u>, 561 F.3d at 211.

Arrowpoint Capital respectfully requests that this Court reverse the district court's denial of the Motions to Supplement.

III.    **UPON REMAND, THIS CASE SHOULD BE REASSIGNED TO A DIFFERENT DISTRICT COURT JUDGE.**

A.    Standard of Review

Federal appellate courts have the authority to reassign a case to a different district court judge under their supervisory powers codified in 28 U.S.C. § 2106. United States v. Kennedy, 682 F.3d 244, 258 (3d Cir. 2012).    Although reassignment is rare, it can be necessary, even absent overt bias, to maintain "the appearance of justice."    United States v. McDavid, 41 F.3d 841, 844 (2d Cir. 1994).  The appearance of neutrality is a critical feature of our justice system; it "generat[es] the feeling, so important to a popular government, that justice has been done." Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (1980) (citing Joint Anti-Fascist Comm. v. McGrath, 341 U.S. 123, 172 (1951) (Frankfurter, J., concurring)).  Thus, the Third Circuit's test for ordering reassignment is whether "a reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned."    United States v. Bergrin, 682 F.3d 261, 282 (2012).  The issue is not whether the district court was actually biased, but whether the circumstances at issue give rise to the *appearance* of partiality.  Haines v. Liggett Grp. Inc., 975 F.2d 81, 98 (1992).  Here, the district court's delay of more than three years in ruling on the Injunction Motion, coupled with cursory denial of motions to provide evidence of continuing confusion during the delay, warrants reassignment to a different judge.

B.     The District Court's Delay in Deciding the Injunction Motion Would Cause a Reasonable Person to Question the District Court's Impartiality.

The delay of three years and two months in issuing a ruling on the pending Injunction Motion is, by itself, a sufficient reason to reassign the case. Circuit Courts of Appeals have reassigned cases involving shorter delays. The Eleventh Circuit reassigned a case in which the district court judge failed for two years to confront the merits of an attorney's motion to withdraw. Brooks v. Cent. Bank of Birmingham, 717 F.2d 1340, 1343 (11th Cir. 1983). Recognizing the "stalemated posture," the court determined it had "no other alternative except to direct that the case be transferred to another district judge for a determination on the merits of the motion." Id. The Seventh Circuit reassigned a case where the district court judge waited two years before ruling on a fee petition and then dismissed it without any reference to its merits. Yang v. City of Chicago, 137 F.3d 522, 527 (7th Cir. 1998).

Here, the district court delayed for three years and two months in deciding a time-sensitive request for a preliminary injunction. "The whole point of the Rule 65 remedy is that, in certain narrow contexts, justice delayed truly is justice denied." Bill Salter Adver., Inc. v. City of Brewton, Al., 486 F.Supp.2d 1314, 1322 (3d Cir. 2007); see also Ofc. Comm. Baseball v. Markell, 579 F.3d 293, 297 (3d Cir. 2009) ("When a party seeks injunctive relief, the stakes are high, time is of the essence, and a straightforward legal question is properly presented to us,

prudence dictates that we answer that question with dispatch."). With this delay, the district court effectively deprived Arrowpoint Capital of its Rule 65 remedy before it ever considered the merits of the Injunction Motion. Here, as in <u>Brooks</u> and <u>Yang</u>, reassignment is appropriate.

In addition, the district court's delay created circumstances that would cause a reasonable person to question the court's impartiality. <u>See</u> <u>Bergrin</u>, 682 F.3d at 282. Given the length of the delay, the district court could hardly have granted the Injunction Motion – to do so would establish that despite its duty to act "with dispatch," it permitted irreparable harm to continue for more than three years. <u>See</u> <u>Ofc. Comm. Baseball</u>, 579 F.3d at 297. In other words, a reasonable person could conclude that district court's delay left it with no option but to deny the Injunction Motion.

The district court's delay affected how the parties presented the merits of the case to the Court. In opposing Arrowpoint Capital's First Motion to Supplement, Appellees argued that the passage of time was a substantive reason to deny the Injunction Motion. J.A. 211–12 ("At this late date a preliminary injunction would *alter* the *status quo* that has been in effect for over four years and effectively give Plaintiff the full relief it seeks on the merits of the case without affording Defendants full discovery and a trial."). In other words, the Appellees attempted to redefine the *status quo* by using to their advantage the district court's delay in

deciding the fully briefed Injunction Motion.  When a district court's delay provides a new, merits-based argument to one party at the expense of the other, a reasonable person would question the court's impartiality.

The district court's denial of Arrowpoint Capital's two Motions to Supplement also would lead a reasonable person to question the district court's impartiality.  Regarding the First Motion to Supplement, the district court summarily denied Arrowpoint Capital's motion after Arrowpoint Capital contacted the court to inquire about the status of the pending motions, simply by writing the word "denied" across the face of the proposed order submitted with the motion. J.A. 2.  Similarly, the district court denied the Second Motion to Supplement in a one-sentence order, with no explanation.  J.A. 3.  The timing and cursory nature of these rulings – while the time-sensitive Injunctive Motion lay dormant – call into question the district court's impartiality.

The appearance of impartiality was further undermined by the district court's disregard for Arrowpoint Capital's affidavits.  The district court stated that it viewed the affidavits – sworn under penalty of perjury and uncontroverted by any evidence – "with great skepticism, given the interested sources and the inability to cross-examine the supposedly confused individuals." J.A. 17.  Yet, such affidavits are a common, well accepted means of presenting evidence in the context of what are intended to be expedited injunction proceedings, <u>Kos</u>

Pharmaceuticals, 369 F.3d at 718–20.  Moreover, Arrowpoint Capital's witnesses were indeed subject to cross-examination via deposition.  To prove actual confusion, Arrowpoint Capital submitted affidavits of Eric Chen, J.A. 249–72, Cynthia Byers, J.A. 273–76, David Shumway, J.A. 277–82, and Catherine Carlino, J.A. 2306–637.  Appellees cross-examined Ms. Byers, Mr. Shumway, and Ms. Carlino at the Rule 30(b)(6) deposition of Arrowpoint Capital.  J.A.196–209, 1424–37.  The Appellees chose not to depose Mr. Chen even though they only used two of their three available depositions.  Compare J.A. 130, with J.A. 148–156.

The district court rejected this evidence because the witnesses had not been subject to cross-examination, while at the same time rejecting Arrowpoint Capital's request for a hearing, which would have afforded the opportunity for precisely the type of probing of the evidence that the district court complained was lacking.  J.A. 162.  In effect, the district court held Arrowpoint Capital to an impermissibly high evidentiary standard, and then, by its own actions, the district court prevented Arrowpoint Capital from meeting this standard.

In analogous circumstances, the Second Circuit recently reassigned a case in which the district court judge described a party's affidavits as "incredible or inapposite" without actually hearing the witnesses.  See United States v. City of New York, 717 F.3d 72, 99–100 (2d Cir. 2013).  The present case offers even more

compelling grounds for reassignment because Arrowpoint Capital actually requested a hearing. When viewing the district court's treatment of Arrowpoint Capital's evidence in the context of the history of delay, a reasonable person would question the district court's impartiality.

Even though reassignment is an extraordinary remedy, Arrowpoint Capital respectfully submits that reassignment is appropriate in this case.

## <u>CONCLUSION</u>

For the foregoing reasons, Arrowpoint Capital respectfully requests that this Court reverse the district court's Orders denying the Injunction Motion and the two Motions to Supplement and enter an order granting the Injunction Motion. Arrowpoint Capital further requests that, upon remand, this Court reassign this case to a different district court judge.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Arrowpoint Capital requests oral argument. This case meets the standards of Fed. R. App. P. Rule 34(a)(2)  for oral argument in that the appeal is not frivolous, the dispositive issues raised have not been recently and authoritatively addressed, and the decision process would be significantly aided by oral argument.


Respectfully submitted,

**NEXSEN PRUET, PLLC**

/s/ Corby C. Anderson
Corby C. Anderson (N.C. Bar No. 20829)
227 West Trade Street, Suite 1550
Charlotte, North Carolina 28202
Tel:  (704) 338-5331
Fax:  (704) 805-4738
canderson@nexsenpruet.com


**PARKOWSKI, GUERKE & SWAYZE**

/s/ Michael W. Arrington
Michael W. Arrington
800 King Street, Suite 203
Wilmington, Delaware 19801
Tel: (302) 594-3333
marrington@pgslegal.com

*Attorneys for Plaintiffs-Appellants*
*Arrowpoint Capital Corp.*

## <u>CERTIFICATE OF BAR MEMBERSHIP</u>

Pursuant to 3d Cir. L.A.R. 28.3(d), I certify that I am a member in good

standing of the United States Court of Appeals for the Third Circuit.


/s/ Corby C. Anderson
Corby C. Anderson


Date:  October 6, 2014

**<u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>**
**Certificate of Compliance with Type-Volume Limitation,**
**Typeface Requirements, and Type Style Requirements**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains 13,476 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    This brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.


                              /s/ Corby C. Anderson
                              Corby C. Anderson


Date:  October 6, 2014

## <u>VIRUS CERTIFICATION & IDENTICAL COMPLIANCE OF BRIEF</u>

I, Samantha Collins, hereby certify that:

The electronic version of this brief is identical to the text version in the paper copies filed with the court. This document was scanned using Trend Micro Titanium Internet Security (with updated virus definition file as of October 6, 2014) and no viruses were detected.

Dated: October 6, 2014
      New York, New York

/s/ Samantha Collins
Samantha Collins

## <u>CERTIFICATE OF SERVICE & CM/ECF FILING</u>

### 14-3063

I hereby certify that I caused the foregoing Brief for Plaintiff-Appellant and Joint Appendix, Volume I of VI to be served on counsel for Defendants-Appellees via the Notice of Docket Activity generated by the Court's electronic filing system (i.e., CM/ECF) and via electronic mail pursuant to Local Appellate Rules 31.1(d) and 113.4(a):

Todd A. Coomes
Robert W. Whetzel
Richards, Layton & Finger
920 North King Street
One Rodney Square
Wilmington, Delaware 19801
(302) 651-7507

Jaclyn H. Grodin
Lewis D. Prutzman
Tannenbaum, Helpern, Syracuse
  & Hirschtritt
900 Third Avenue
New York, New York 10022
(212) 508-6776

I certify that an electronic copy was uploaded to the Court's electronic filing system. Ten hard copies of the foregoing Brief for Plaintiff-Appellant and Joint Appendix, Volume I of VI were sent to the Clerk's Office via Federal Express Next Business Day Delivery to:

Clerk of Court
United States Court of Appeals, Third Circuit
Independence Mall West
601 Market Street
Philadelphia, Pennsylvania 19106
(215) 597-2995

on this 6th day of October 2014.          /s/ Samantha Collins
                                          Samantha Collins

**JOINT APPENDIX, VOLUME I OF VI**
**(Pages JA-1 to JA-23)**

# TABLE OF CONTENTS

PAGE

## Volume I of VI
## (Bound with Appellant's Brief)

Notice of Appeal,
    filed June 17, 2014 ............................................... JA-1

Order of District Court Denying Arrowpoint Capital's
    First Motion to Supplement Evidence of Confusion,
        entered September 18, 2013 ........................................ JA-2

Order of District Court Denying Arrowpoint Capital's
    Second Motion to Supplement Evidence of Confusion,
        entered March 25, 2014 ........................................... JA-3

Memorandum and Order of District Court Denying Arrowpoint
    Capital's Motion for Preliminary and Permanent Injunction,
        entered May 20, 2014 ........................................... JA-4

## Volume II of VI

District Court Docket,
    printed October 1, 2014 ......................................... JA-24

Arrowpoint Capital's Verified Complaint,
    filed February 26, 2010 ......................................... JA-38

    Exhibit A to Verified Complaint—
    Reg. No. 3,484,564 ........................................... JA-55

    Exhibit B to Verified Complaint—
    Verification of David Shumway ............................... JA-109

    Civil Cover Sheet, dated February 26, 2010 .................... JA-112

ii

PAGE

Arrowpoint Capital's Motion for Preliminary and
    Permanent Injunction,
        filed February 26, 2010 ......................................... JA-113

Defendants' Answer,
        filed April 9, 2010 ............................................. JA-115

Scheduling Order,
        entered October 4, 2010 ....................................... JA-130

Arrowpoint Capital's Notice to Take Rule 30(b)(6) Deposition of
    Arrowpoint Asset Management, LLC,
        filed October 13, 2010 ......................................... JA-132

Arrowpoint Capital's Notice to Take Deposition of David Corkins,
        filed October 13, 2010 ......................................... JA-143

Arrowpoint Capital's Notice of Service of Supplemental Rule 26
    Initial Disclosures,
        filed October 29, 2010. ........................................ JA-146

Defendants' Notice to Take Rule 30(b)(6) Deposition of
    Arrowpoint Capital Corp.,
        filed November 1, 2010 ........................................ JA-148

Defendants' Notice to Take Deposition of David Shumway,
        filed November 1, 2010 ........................................ JA-156

Arrowpoint Capital's Notice to Take Deposition of Richard Grove,
        filed November 9, 2010. ....................................... JA-159

Arrowpoint Capital's Notice of Completion of Briefing and
    Request for Oral Argument,
        filed March 15, 2011 .......................................... JA-162

iii

PAGE

Arrowpoint Capital's Certificate of Service of
Request for Oral Argument,
filed March 15, 2011 ........................................... JA-164

Arrowpoint Capital's Second Supplemental
Rule 26 Initial Disclosures,
filed dated August 16, 2012 .................................... JA-165

Arrowpoint Capital's Motion to Supplement Evidence of Confusion,
filed August 20, 2012 .......................................... JA-176

Index of Exhibits to First Motion to Supplement................. JA-179

Exhibit 1 to First Motion to Supplement—
Second Affidavit of Eric Chen.................................. JA-180

Exhibit A—
Bloomberg Chat Exchange with Sarah Farkas ............... JA-183

Exhibit B—
List of Attendees at ABS East Conference .................. JA-185

Exhibit 2 to First Motion to Supplement—
Second Affidavit of Cynthia Byers ............................ JA-190

Exhibit 3 to First Motion to Supplement—
Second Affidavit of Ray Trogdon.............................. JA-193

Exhibit 4 to First Motion to Supplement—
Affidavit of Michelle Meeks .................................. JA-196

Exhibit A—
Email from Brad Melchin to Michelle Meeks ............... JA-199

Exhibit 5 to First Motion to Supplement—
Affidavit of Karen Estridge .................................. JA-202

Exhibit A—
Email from Kendra Harrington to Karen Estridge ........... JA-207

Exhibit 6 to First Motion to Supplement—
Proposed Order .............................................. JA-210

iv

PAGE

Defendants' Opposition to Plaintiff's First Motion to Supplement,
    filed September 5, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-211

Arrowpoint Capital's Certificate of Service of
    Third Supplemental Rule 26 Initial Disclosures,
    filed September 20, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-218

Arrowpoint Capital's Fourth Supplemental
    Rule 26 Initial Disclosures,
    filed March 22, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-219

Defendants' Opposition to Plaintiff's Second Motion to Supplement,
    filed May 2, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-231

Letter from Michael W. Arrington to the Honorable Gregory M. Sleet,
    filed August 13, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-242

**Volume III of VI**
**[Filed Under Seal]**

Arrowpoint Capital's Exhibits to Supplemental Brief in Support of its
    Motion for a Preliminary and Permanent Injunction,
    filed December 29, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-243

    Index of Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-246

    Exhibit 1—
    Affidavit of Eric Q. Chen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-249

        Exhibit A—
        May 2009 e-mail negotiating TALF Agreement  . . . . . . . . . . . . JA-253

        Exhibit B—
        August 2009 e-mail regarding Citigroup TALF application . . JA-257

        Exhibit C—
        ASF 1020 Investor and CDO Collateral Manager
        Registrants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-261

v

PAGE

Exhibit 2—
Affidavit Cynthia A. Byers ................................... JA-273

Exhibit 3—
Affidavit of David D. Shumway .............................. JA-277

Exhibit 4—
Excerpts from the Deposition of Arrowpoint Capital Corp.,
by 30(b)(6) Witness David D. Shumway ....................... JA-283

Exhibit 5—
Excerpts from the Deposition of Arrowpoint Capital Corp.,
by 30(b)(6) Witness Cynthia A. Byers ......................... JA-291

Exhibit 6—
Excerpts from the Deposition of Arrowpoint Asset Management,
LLC, by 30(b)(6) Witness Richard A. Grove .................... JA-295

Exhibit 7—
Excerpts from the Deposition of Richard A. Grove ............. JA-377

Exhibit 8—
Excerpts from the Deposition of David J. Corkins ............... JA-386

Exhibit 9—
Defendants' Responses and Objections to Plaintiff's First
Interrogatories and Request for Production of Documents -
Excerpts ................................................... JA-414

Exhibit 10—
Defendants' Supplemental Responses to Certain of Plaintiff's
First Interrogatories - Excerpts ............................... JA-423

Exhibit 11—
U.S. Patent and Trademark Office Actions ..................... JA-430

Exhibit 12—
March 4, 2007 press release ................................. JA-456

Exhibit 13—
Redefining Success presentation .............................. JA-458

vi

PAGE

Exhibit 14—
Manhattan Re Investment Portfolio Analysis presentation ....... JA-471

Exhibit 15—
Intrepid Re Agreement for Investment Management Services .... JA-484

Exhibit 16—
October 9, 2006 e-mail regarding retaining Intrepid Re as client
after acquisition ................................................ JA-493

Exhibit 17—
September 14, 2009 letter regarding liquidation of Intrepid Re's
assets ......................................................... JA-502

Exhibit 18—
July 1, 2009 Amended and Restated Confidential Private
Placement Memorandum for Arrowpoint Fundamental
Opportunity Fund, L.P. ......................................... JA-504

Exhibit 19—
Arrowpoint Capital Company Name Protocols .................. JA-603

Exhibit 20—
March 6, 2007 name change e-mail ........................... JA-606

Exhibit 21—
March 9, 2007 letter to JPMorgan regarding name change ....... JA-609

Exhibit 22—
March 2007 Arrowpoint Capital Style Guidelines ............... JA-611

Exhibit 23—
Arrowpoint Capital sinage diagram ........................... JA-624

Exhibit 24—
Press release regarding event sponsorship ..................... JA-626

Exhibit 25—
April 27, 2009 Confidential Private Placement Memorandum for
Arrowpoint Structured Opportunity Fund, LP ................... JA-628

vii

PAGE

Exhibit 26—
Thompson Compumark Search Report excerpts ................. JA-722

Exhibit 27—
Arrowpoint Asset Management Trademark/Service Mark
Application ................................................. JA-731

Exhibit 28—
Fund Portfolio Analysis as of April 30, 2009 ................... JA-744

Exhibit 29—
AP Firmwide Purchases and Sales .............................. JA-752

Exhibit 30—
April 15, 2009 e-mail regarding JPMorgan trade ................ JA-758

Exhibit 31—
April 15, 2009 CUSIP 362244AA3 cancelled trade confirm ..... JA-761

Exhibit 32—
June 4, 2009 e-mail regarding JPMorgan trade and attached trade
confirm for CUSIP ........................................... JA-766

Exhibit 33—
June 4, 2009 CUSIP 16157DJ0 cancelled trade confirm .......... JA-769

Exhibit 34—
January 1, 2009 through September 30, 2009 Purchases Journal
and Sales Journal .......................................... JA-774

Exhibit 35—
July 15, 2009 e-mail regarding JPMorgan trade of CUSIP
46625M2L2 ................................................ JA-800

Exhibit 36—
July 16, 2009 e-mail regarding JPMorgan trade of CUSIP
46625M2L2 ................................................ JA-802

Exhibit 37—
July 15, 2009 CUSIP 46625M2L2 cancelled trade confirm ...... JA-806

viii

PAGE

Exhibit 38—
June 30, 2009 redacted e-mail from Stroock Stroock & Lavan ... JA-809

Exhibit 39—
Morgan Stanley address change confirmation .................... JA-812

Exhibit 40—
Morgan Stanley address change confirmation .................... JA-814

Exhibit 41—
April 27, 2010 Citigroup request for information ............... JA-816

Exhibit 42—
July 8, 2010 BAML e-mail regarding confusion ................. JA-819

Exhibit 43—
July 25, 2010 e-mail regarding confusion at BAML ............. JA-822

Exhibit 44—
July 2, 2009 cease-and-desist demand ......................... JA-824

Exhibit 45—
July 29, 2009 response to cease-and-desist demand ............. JA-837

Exhibit 46—
February 24, 2010 Notice of Opposition ........................ JA-840

Exhibit 47—
May 11, 2010 Notice of Default ............................... JA-853

Exhibit 48—
August 12, 2010 cease-and-desist demand to
Arrowpoint Insurance ......................................... JA-855

Exhibit 49—
Arrowpoint Insurance's September 28, 2010 agreement to change
name ........................................................ JA-859

Exhibit 50—
Arrowpoint Partners Arrowpoint Equity Opportunity Fund
presentation ................................................. JA-861

ix

PAGE

Exhibit 51—
Arrowpoint Partners Overview presentation  ..................... JA-904

Exhibit 52—
Arrowpoint Partners Fundamental Opportunity Fund, LP
presentation  ................................................. JA-928

**Volume IV of VI**
**[Filed Under Seal]**

Declaration of L. Donald Prutzman, submitted by Defendants in
    opposition to Arrowpoint Capital's Motion for a Preliminary and
    Permanent Injunction, and Volume 1 of accompanying exhibits,
    filed February 14, 2011 ......................................... JA-979

Exhibit 1—
Thompson Compumark Research Report ........................ JA-993

Exhibit 2—
Public filings with the USPTO, dated January 4, 2007 .......... JA-1069

Exhibit 3—
Public filings with the USPTO, dated January 11, 2008 ......... JA-1327

Exhibit 4—
Public filings with the USPTO, dated January 14, 2008 ......... JA-1337

Exhibit 5—
Public filings with the USPTO, dated July 21, 2008 ............ JA-1347

Exhibit 6—
Public filings with the USPTO, dated July 21, 2008 ............ JA-1357

Exhibit 7—
Public filings with the USPTO, dated August 25, 2008 ......... JA-1367

Exhibit 8—
Public filings with the USPTO, dated September 28, 2009 ...... JA-1377

Exhibit 9—
TTAB Order, dated September 21, 2010 ........................ JA-1381

x

PAGE

Exhibit 10—
U.S. Trademark Registration Nos. 2,172,436 and 2,182,114 . . . . .  JA-1383

Exhibit 11—
U.S. Trademark Registration Nos. 1,085,678; 1,761,694; and
3,506,139 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA-1386

Exhibit 12—
U.S. Trademark Registration Nos. 1,667,834 and 1,397,111  . . . .  JA-1390

Exhibit 13—
U.S. Trademark Registration Nos. 3,448,563 and 2,297,714  . . . .  JA-1393

Exhibit 14—
U.S. Trademark Registration Nos. 1,459,528; 3,252,850; and
2,538,472 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA-1396

Exhibit 15—
U.S. Trademark Registration Nos. 3,311,483 and 3,412,338  . . . .  JA-1400

Exhibit 16—
U.S. Trademark Registration Nos. 3,646,445 and 2,558,710 . . . . .  JA-1403

Exhibit 17—
U.S. Trademark Registration Nos. 1,479,951 and 2,881,946 . . . . .  JA-1406

Exhibit 18—
U.S. Trademark Registration Nos. 2,042,044 and 3,637,777 . . . . .  JA-1409

Exhibit 19—
Excerpts from the Deposition of Arrowpoint Capital Corp. by
30(b)(6) Witness David D. Shumway . . . . . . . . . . . . . . . . . . . . . . . . .  JA-1412

Exhibit 20—
Excerpts from the Deposition of Arrowpoint Capital Corp. by
30(b)(6) Witness Catherine Ann Carlino . . . . . . . . . . . . . . . . . . . . . .  JA-1424

Exhibit 21—
Excerpts from the Deposition of Arrowpoint Capital Corp. by
30(b)(6) Witness Cynthia Ann Byers . . . . . . . . . . . . . . . . . . . . . . . . . .  JA-1438

xi

PAGE

Exhibit 22—
Excerpts from the Deposition of David D. Shumway............ JA-1442

Exhibit 23—
Excerpts from the Deposition of Arrowpoint Asset Management,
LLC, by 30(b)(6) Witness Richard A. Grove ................... JA-1447

**Volume V of VI**
**[Filed Under Seal]**

Volume 2 of Exhibits accompanying the Declaration of
L. Donald Prutzman ........................................... JA-1453

Exhibit 24—
Excerpts from the Deposition of David J. Corkins .............. JA-1454

Exhibit 25—
March 19, 2007 email from David Shumway re: "we are now
AIMCO" ..................................................... JA-1475

Exhibit 26—
April 18, 2007 letters from Arrowpoint Capital to various
financial institutions .......................................... JA-1480

Exhibit 27—
May 19, 1999 press release re: "Royal & Sun Alliance Insurance
Group PLC, ACE Bermuda Insurance Ltd. and Aon Corporation
Announce Formation of New Insurance and Reinsurance Entity"
named Intrepid Re Limited .................................... JA-1486

Exhibit 28—
"Fund management questionnaire" ............................ JA-1489

Exhibit 29—
December 11, 2007 "AIMCO Capabilities and Competitive
Advantage Analysis and Discussion," by David Shumway ...... JA-1492

xii

PAGE

Exhibit 30—
Email string including November 13, 2008 email from
David Shumway to Rian Hubbel re "Asset Management
Opportunity?" ............................................... JA-1514

Exhibit 31—
March 11, 2010 excerpt from a PowerPoint presentation made to
Manhattan Re ................................................ JA-1523

Exhibit 32—
Summary of AIMCO Fees through March 31, 2010 ............ JA-1529

Exhibit 33—
Form A Statement Regarding the Acquisition of Control of or
Merger with a Domestic Insurer submitted to Delaware Insurance
Dept. ....................................................... JA-1566

Exhibit 34—
Page from Arrowpoint Capital website ......................... JA-1577

Exhibit 35—
Page from Arrowpoint Capital website ......................... JA-1579

Exhibit 36—
January 15, 2008 email string attaching "Arrowpoint Trademark
Chart" ...................................................... JA-1581

Exhibit 37—
Arrowpoint Capital's trademark registration certificates ........ JA-1588

Exhibit 38—
November 22, 201 page from Arrowpoint Capital's website .... JA-1591

Exhibit 39—
November 22, 2010 products & services browser from
Arrowpoint Capital's website ................................. JA-1593

Exhibit 40—
May 13, 2009 email from Dave Shumway to Cathy Carlino and
others, and prior emails ...................................... JA-1596

xiii

PAGE

Exhibit 41—
July 2, 2009 letter from Jayne C. Hunter, Esq. to "Mr. Tim
Shannon" of Arrowpoint Asset Management, LLC ............. JA-1605

Exhibit 42—
July 29, 2009 letter from L. Donald Prutzman
to Jayne C. Hunter ........................................... JA-1608

Exhibit 43—
August 18, 2009 public records corporate filings search re
company names containing "Arrowpoint" ...................... JA-1611

Exhibit 44—
August 25, 2009 email from Cathy Carlino to Kedar Bryan re
registration of AIMCO trademark ............................ JA-1625

Exhibit 45—
Delaware Insurance Commission Examination Report of the
Arrowood Indemnity Company as of December 31, 2007 ....... JA-1627

Exhibit 46—
Delaware Insurance Commission Examination Report of the
Arrowood Surplus Lines Insurance Company as of
December 31, 2007 ........................................... JA-1670

Exhibit 47—
March 29, 2010 email from Cynthia Byers to Griffin Maloney of
Goldman Sachs and others, and prior emails ................... JA-1705

Exhibit 48—
May 10, 2007 email from Ray Trogdon to Peggy Markt and prior
emails ...................................................... JA-1719

Exhibit 49—
September 24, 2009 email from Ray Trogdon to Peggy Markt and
prior emails ................................................. JA-1727

Exhibit 50—
July 10, 2007 email from Peggy Markt to Winnie Donaldson
re "Business Card Order" and prior emails .................... JA-1732

xiv

PAGE

Exhibit 51—
March 31, 2010 email from Ariane Parisi to Judy Spitzer
re Arrowood Indemnity Company and prior emails ............. JA-1739

Exhibit 52—
February 25, 2010 email from Cynthia Byers to Faith Klaus
and Tim Schaefer of Chapdelain Credit, attaching AIMCO
portfolio .................................................... JA-1742

Exhibit 53—
May 10, 2007 email from Gregg Pendergast of Franklin Portfolio
to Ray Trogden and prior emails .............................. JA-1749

Exhibit 54—
Arrowpoint Asset Management, LLC investment advisor
registration pursuant to section 203 of the Investment Advisors
Act of 1940 ................................................. JA-1755

Volume 3 of Exhibits accompanying the Declaration of
L. Donald Prutzman .......................................... JA-1849

Exhibit 55—
April 27, 2009 Private Placement Memorandum for Arrowpoint
Structured Opportunity Fund, LP ............................. JA-1850

Exhibit 56—
July 1, 2009 Private Placement Memorandum for Arrowpoint
Fundamental Opportunity Fund, LP ........................... JA-1944

Exhibit 57—
Arrowpoint Partners website content .......................... JA-2043

Exhibit 58—
June 2010 PowerPoint presentation re Arrowpoint Fundamental
Opportunity Fund ............................................ JA-2070

Exhibit 59—
Arrowpoint Partners Income Report ........................... JA-2121

Exhibit 60—
Arrowpoint Partners Overview PowerPoint presentation ........ JA-2123

xv

PAGE

Exhibit 61—
Investment Advisors Act of 1940 § 203, 15 U.S.C. § 80b-3, and
Definition of "accredited investor" from SEC Regulation D, 17
C.F.R. § 230.501 ............................................. JA-2150

Exhibit 62—
North Carolina General Statutes Annotated (N.C.G.S.A.) § 78C-
16—Investment Advisor Registration and Notice Filing
Requirement.................................................. JA-2159

**Volume VI of VI**
**[Filed Under Seal]**

Affidavit of Richard A. Grove, submitted by Defendants
    in opposition to Arrowpoint Capital's
    Motion for a Preliminary and Permanent Injunction,
    filed February 14, 2011 ....................................... JA-2170

Exhibit 63 to Grove Affidavit—
Press Coverage .............................................. JA-2176

Exhibit 64 to Grove Affidavit—
Excerpts from a Report published by the Federal Reserve Bank
of New York concerning the TALF program ................... JA-2187

Affidavit of David J. Corkins, submitted by Defendants
    in opposition to Arrowpoint Capital's
    Motion for a Preliminary and Permanent Injunction,
    filed February 14, 2011 ....................................... JA-2191

Arrowpoint Capital's Exhibits to Reply Brief in Support of its
    Motion for a Preliminary and Permanent Injunction,
    filed March 9, 2011........................................... JA-2195

Index of Exhibits ............................................ JA-2195

Exhibit 53—
Second Affidavit of Eric Q. Chen............................. JA-2197

xvi

PAGE

Exhibit A—
ASF 2011 Investor Registrants ............................ JA-2203

Exhibit 54—
Second Affidavit of David D. Shumway ....................... JA-2218

Exhibit A—
November 23, 2010 Article, New Swiss Re sigma study
examines the impact of the financial crisis and changing
regulations on insurers' asset mangement .................. JA-2229

Exhibit B—
Intrepid Re Agreement for Investment Management
Services ................................................. JA-2234

Exhibit C—
Pension Agreement for Investment Management Services... JA-2243

Exhibit D—
Liberty Mutual's Management Discussion & Analysis of
Financial Condition and Results of Operations ............. JA-2252

Exhibit 55—
Affidavit of Catherine A. Carlino............................ JA-2306

Exhibit A—
Arrowpoint Capital's Thompson Compumark
Search Report ........................................... JA-2312

Exhibit B—
Chart showing Arrowpoint Capital's corporate structure.... JA-2638

Exhibit 56—
June 27, 2010 Bloomberg Chat ............................... JA-2640

Exhibit 57—
Arrowpoint Asset Management, LLC investment advisor
registration pursuant to section 203 of the Investment Advisors
Act of 1940 .............................................. JA-2642

Exhibit 58—
Arrowpoint Capital's Rule 26(a) Initial Disclosures ............ JA-2645

xvii

PAGE

Exhibit 59—
Affidavit of Jane Conway Hunter ............................. JA-2653

    Exhibit A—
    Trademark/Service Mark Statements of Use ................ JA-2658

Exhibit 60—
Excerpts from the deposition of Arrowpoint Asset Management,
LLC, by 30(b)(6) Witness Richard A. Grove ................... JA-2665

Exhibit 61—
*Am. Fidelity & Liberty Ins. Co. v. Am. Fidelity Group*, No. 97-
4307, 2000 U.S Dist. LEXIS 13863 (E.D. Pa. Sept. 25, 2000) ... JA-2673

Exhibit 62—
*Grand Heritage Mgmt., LLC v. Murphy*, No. 06 Civ. 5977
(NRB), 2007 U.S. Dist. LEXIS 83114 (S.D.N.Y. Nov. 6, 2007) . JA-2697

Exhibit 63—
*Power Integrations, Inc. v. BCD Semiconductor Corp.*,
No. 07-633-JJF-LPS, 2008 U.S. Dist. LEXIS 10833
(D. Del. Nov. 19, 2008) ....................................... JA-2707

Arrowpoint Capital's Second Motion to Supplement Evidence of
    Confusion,
    filed April 15, 2013 ......................................... JA-2721

Index of Exhibits to Second Motion to Supplement ............. JA-2733

Exhibit 1 to Second Motion to Supplement—
Second Affidavit of Karen Estridge ........................... JA-2734

    Exhibit A—
    Email from Amy Andrus to Karen Estridge,
    dated November 20, 2012 ................................. JA-2738

    Exhibit B—
    Email correspondence between Stephen Lent
    and Karen Estridge ....................................... JA-2740

Exhibit 2 to Second Motion to Supplement—
Affidavit of Kedar Bryan ..................................... JA-2744

xviii

PAGE

Exhibit A—
*Business Wire* Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-2747

Exhibit 3 to Second Motion to Supplement—
Third Affidavit of Eric Chen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-2750

Exhibit A—
Communication between Eric Chen and David Cantor . . . . . . JA-2754

Exhibit 4 to Second Motion to Supplement—
Affidavit of Sandra Vogel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-2756

Exhibit 5 to Second Motion to Supplement—
Third Affidavit of Cynthia Byers . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA-2759

Exhibit A—
Screen shots of the POINT System . . . . . . . . . . . . . . . . . . . . . . . . . JA-2762

## NOTICE OF APPEAL
## TO
## U.S. COURT OF APPEALS, THIRD CIRCUIT

**U.S. District Court for the District of Delaware**

**CIRCUIT COURT
DOCKET NUMBER:** _____

**FULL CAPTION IN DISTRICT COURT AS FOLLOWS:**

**ARROWPOINT CAPITAL CORP.,**
**PLAINTIFF**

v.

**DISTRICT COURT
DOCKET NUMBER: 10-161-GMS**

**DISTRICT COURT
JUDGE: Gregory M. Sleet**

**ARROWPOINT ASSET MANAGEMENT, LLC;
ARROWPOINT PARTNERS GP, LLC;
ARROWPOINT PARTNERS GP2, LLC;
ARROWPOINT FUNDAMENTAL OPPORTUNITY
FUND, LP; AND ARROWPOINT STRUCTURED
OPPORTUNITY FUND, LP,**
**DEFENDANTS**

Notice is hereby given that Arrowpoint Capital Corp., Plaintiff,_____

Appeals to the United States Court of Appeal for the Third Circuit from the Memorandum and

final Order entered in this action on May 20, 2014, together with the incorporated orders denying

leave to supplement the record.

Dated: June 17, 2014

_____
(Counsel for Appellant-Signature)

Michael W. Arrington (DE Bar #3603)
(Name of Counsel - Typed)

800 King Street, Suite 203
(Address)

Wilmington, DE  19801
(City, State Zip)

(302) 654-3300
(Telephone Number)

Robert W. Whetzel, (DE Bar #2288)
(Counsel for Appellee)

One Rodney Square, 920 King Street
(Address)

Wilmington, DE  19801
(City, State Zip)

(302) 651-7634
(Telephone Number)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ARROWPOINT CAPITAL CORP.,

      Plaintiff.

  v.

ARROWPOINT ASSET MANAGEMENT,
LLC; ARROWPOINT PARTNERS GP, LLC;
ARROWPOINT PARTNERS GP2, LLC;
ARROWPOINT FUNDAMENTAL
OPPORTUNITY FUND, LP; and
ARROWPOINT STRUCTURED
OPPORTUNITY FUND, LP,

      Defendants.

Civil Action No. 1:10–cv–00161–GMS

### ORDER

**UPON CONSIDERATION** of the Plaintiff's Motion to Supplement Evidence of Confusion and the Response, if any,

**IT IS HEREBY ORDERED** this 18ᵗʰ day of ~~August, 2012~~ Sept, 2013, that the Motion is
DENIED. ~~GRANTED.~~

**IT IS FURTHER ORDERED** that the record is supplemented with Plaintiff's five affidavits submitted with the Motion.

_____
The Honorable Gregory M. Sleet
United States District Court Chief Judge

**JA-3**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ARROWPOINT CAPITAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 10-161-GMS |
| | ) | |
| ARROWPOINT ASSET MANAGEMENT, | ) | |
| LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Upon consideration of the Plaintiff's (Sealed) Motion for Leave to File Plaintiff's Second

Motion to Supplement Evidence of Confusion (D.I. 87), and Motion for Leave to File Redacted

Motion for Leave to File Plaintiff's Second Motion to Supplement Evidence of Confusion (D.I.

88), and the Defendants' response thereto (D.I. 90),

IT IS HEREBY ORDERED that:

The Motions to Supplement Evidence of Confusion (D.I. 87 and D.I. 88) are DENIED.

Date: 3/25/14

CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ARROWPOINT CAPITAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.  10-161-GMS |
| | ) | |
| ARROWPOINT ASSET MANAGEMENT, | ) | |
| LLC; ARROWPOINT PARTNERS GP, LLC; | ) | |
| ARROWPOINT PARTNERS GP2, LLC; | ) | |
| ARROWPOINT FUNDAMENTAL | ) | |
| OPPORTUNITY FUND, LP; and | ) | |
| ARROWPOINT STRUCTURED | ) | |
| OPPORTUNITY FUND, LP, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

## I.    INTRODUCTION

On February 26, 2010, Arrowpoint Capital Corp. ("the plaintiff") filed a complaint

against Arrowpoint Asset Management, LLC ("AAM"), Arrowpoint Partners GP, LLC,

Arrowpoint Partners GP2, LLC, Arrowpoint Fundamental Opportunity Fund, LP, and

Arrowpoint Structured Opportunity Fund, LP (collectively, "the defendants").  (D.I. 1.)  The

plaintiff alleges that the defendants' uses of the "Arrowpoint" name and the 

logo (the "AAM Logo") in connection with investment-related products and services constitute

trademark infringement under the common law and Section 32 of the Lanham Act, 15 U.S.C. §

1114, and unfair competition and false advertising under Section 43(a) of the Lanham Act, 15

U.S.C. § 1125(a), and the Delaware Deceptive Trade Practices Act ("DTPA"), 6 Del. C. §§

2531, *et seq.* (2009).   (*Id.*)  Presently before the court is the plaintiff's motion for a preliminary

and permanent injunction to enjoin the defendants from using the AAM Logo, the "Arrowpoint" element in their names, and any other name or logo similar to the plaintiff's trademarks[1] in connection with investment related products and services. (D.I. 4.) For the reasons discussed below, the plaintiff fails to establish a fundamental requirement for injunctive relief. Therefore, the court denies the plaintiff's motion.

## II.    BACKGROUND

The plaintiff is a holding corporation organized under the laws of Delaware. (D.I. 1, ¶¶ 1, 2.) The plaintiff's subsidiaries Arrowood Indemnity Company and Arrowood Surplus Lines Insurance Company (collectively, "Arrowood") "provide insurance and investment-related financial services for customers throughout the United States" under the trade name "Arrowpoint Capital." (*Id*., ¶ 2.) In 2007, the plaintiff acquired the United States insurance operations of Royal Sun Alliance and Storage Group plc ("Royal") and began managing the run-off of Royal's United States policies. (*Id*., ¶ 3.) As part of that business, the plaintiff asserts that it "manage[s] assets derived from policy premiums." (*Id*.) The plaintiff claims that its "primary source of income is the investment of its reserves in fixed-income securities,"[2] which enables it "to pay its operating costs and meet its financial obligations to policyholders." (D.I. 48 at 1.) The plaintiff also purports to have "provided investment management services to an unaffiliated insurer from March 4, 2007, until October 15, 2009," and marketed its investment management services to

---

[1] More accurately, the plaintiff owns two federally registered service marks. The Lanham Act provides nearly identical definitions for the two terms, except a trademark is used to "identify and distinguish . . . goods," whereas a service mark performs the same function for "services." *See* 15 U.S.C. § 1127. The Lanham Act "generally applies the same principles concerning ... protection to both trade and service marks." *Country Floors, Inc. v. Gepner*, 930 F.2d 1056, 1064 n.2 (3d Cir. 1991) (citing 15 U.S.C. § 1053). Although this is a service mark case, for ease of reference, the court will use the term "trademark" or "mark" in its opinion.

[2] According to the plaintiff, when "insurance operations are in run-off, [the insurance company] no longer collects premiums from its policyholders." (D.I. 48 at 1 n.2.)

other insurers and pension funds.[3]  (*Id.* at 1-2; *see also* D.I. 1, ¶ 3.)

The defendants consist of limited liability companies and limited partnerships organized under the laws of Delaware that have their principal places of business in Denver, Colorado. (*Id.*, ¶¶ 4-8.)  The defendants' entities were formed between December 2007 and April 2009. (*Id.*)  The defendants provide investment-related services including individual investment management accounts and three separate private investment funds, commonly referred to as "hedge funds." (D.I. 58 at 3.)  They manage over $1.5 billion in assets and their customer base consists of "high net worth individuals, companies operating primarily for the benefit of wealthy individuals, family foundations, or trusts." (*Id.* at 2.)

In August 2008, the plaintiff obtained federal registrations from the U.S. Patent and Trademark Office (the "PTO") for the word mark ARROWPOINT CAPITAL and design mark **Arrowpoint Capital** ("AC Logo") (collectively, "Arrowpoint Marks") in International Classification ("I.C.") 36 "in connection with insurance-related products and services."[4] (D.I. 1, ¶¶ 16-17.)  Both registrations were based on use in interstate commerce since March 4, 2007. (*Id.*)  In September 2009, after learning of the alleged defendants' infringement, the plaintiff filed an application to register the word mark ARROWPOINT CAPITAL in I.C. 36 for

---

[3] The court notes that the parties materially dispute whether the alleged "unaffiliated insurer" is actually not affiliated with the plaintiff. (*See* D.I. 58 at 10; D.I. 73 at 5.)

[4] The plaintiff filed the applications on January 14, 2008, and the registration numbers were issued on August 12, 2008. The Certificates of Registration specify that the AC Logo and ARROWPOINT CAPITAL word mark are registered for: "writing property casualty insurance; underwriting in the fields of property and casualty insurance; insurance claims processing; insurance claims servicing, namely claims administration and premium rate computing; actuarial services; and insurance consulting services, in Class 36." (D.I. 1, Ex. A.) According to the PTO, "Class 36 includes mainly services rendered in financial and monetary affairs and services rendered in relation to insurance contracts of all kinds." U.S. Patent and Trademark Office, Nice Agreement Tenth Edition - General Remarks, Class Headings and Explanatory Notes - Version 2012, *available at* http://www.uspto.gov/trademarks/notices/international.jsp (last visited May 5, 2014).

3

"investment management services."[5]  (*Id.*, ¶ 23; D.I. 48 at 2.)  AAM opposed that application, and the proceedings before the Trademark Trial and Appeal Board are currently suspended pending the conclusion of the present litigation. (D.I. 58 at 8.)

The defendants first used word marks containing the ARROWPOINT element in December 2007[6] and adopted the AAM Log in January 2009. (*Id.* at 3.)  The defendants state that they "selected its marks after a clearance procedure that included counsel's review of a full U.S. availability trademark search report." (*Id.*)  In June 2008, the defendants filed a statement of trade name with the Colorado Secretary of State, which indicated that they intended to transact business under the trade name "Arrowpoint Partners." (D.I. 5 at 4.)  In or about February 2008, the defendants began promoting the recognition of their word mark through websites using domain names that include the ARROWPOINT element.[7]  (*Id.*)

## III.    STANDARD OF REVIEW

"The decision to grant or deny . . . injunctive relief is an act of equitable discretion by the district court." *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  "Preliminary injunctive relief is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'" *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426-27 (3d Cir. 1994)).  The moving party seeking a preliminary injunction must establish (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) the balance of equities tips in the moving party's favor; and (4) an injunction is in the public interest. *Winter v.*

---

[5]  The court notes that the plaintiff's intent-to-use application does not establish priority against those already using the mark, nor does it reserve an enforceable right in a mark. *See Lucent Information Mgmt., Inc. v. Lucent Techs., Inc.*, 186 F.3d 311, 313-14 n. 3 (3d Cir. 1999).

[6]  *E.g.*, Arrowpoint Asset Management and Arrowpoint Partners.

[7]  *E.g.*, www.arrowpointassetmanagement.com and www.arrowpointpartners.com.

*NDRC, Inc.*, 555 U.S. 7, 20 (2008). The issuance of a preliminary injunction is only appropriate when the moving party produces sufficient evidence to establish every element in its favor. *See P.C. Yonkers, Inc. v. Celebrations, the Party and Seasonal Superstore, LLC,* 428 F.3d 504, 508 (3d Cir. 2005). "If either or both of the fundamental requirements - likelihood of success on the merits and probability of irreparable harm if relief is not granted - are absent, an injunction cannot issue." *Capriotti's Sandwich Shop, Inc. v. Taylor Family Holdings, Inc.*, 857 F. Supp. 2d 489, 499 (D. Del. 2012) (*citing McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 523 (3d Cir. 1994)).

## IV.    DISCUSSION

The plaintiff argues that it has established rights in its Arrowpoint Marks through valid federal registrations and continuous use in interstate commerce dating back to March 2007, and that its registrations for insurance-related services protects it from the defendants' infringement because investment management is a "fundamental aspect of insurance." (D.I. 73 at 2-3.) As such, it alleges the defendants' unauthorized use of the AAM Logo and Arrowpoint element in connection with the same type of services has caused actual confusion and irreparable harm for which there is no adequate remedy at law. (D.I 48 at 10.) Therefore, the plaintiff argues it is entitled to a preliminary injunction based on: (1) its trademark infringement claims under the Section 32 of the Lanham Act,[8] Delaware common law, and the DTPA; and (2) unfair

---

[8] Section 32 of the Lanham Act provides:
 Any person who shall, without consent of the registrant . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant . . . .
15 U.S.C. §1114(1)(a).

competition and false advertising claims under Section 43(a) of the Lanham Act[9] and the DTPA. (D.I. 5; D.I. 48.)  In response, the defendants argue that the plaintiff's trademark registrations for insurance-related services do not give it the right to block the defendants from using their marks for the distinctly different business of investment management services.  (D.I. 58 at 9.)  In addition, the defendants contend that the plaintiff does not provide investment management services to any *bona fide* third parties, and only manages investments of insurance premiums and other funds for itself and affiliated insurers.  (*Id.* at 5-6.)

### A.    Likelihood of Success on the Merits - Trademark infringement and unfair competition under the Lanham Act

"The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Freedom Card, Inc. v. J.P. Morgan Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005) (quoting *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir. 1994)).  A plaintiff establishes trademark infringement and unfair competition under the Lanham Act by proving that: "(1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark is likely to create confusion concerning the origin of the goods or services." *Id.* (quoting *A&H*

---

[9] While the plaintiff alleges both unfair competition and false advertising under section 43(a) of the Lanham Act, it only briefed and referenced statutory language related to unfair competition.  Under section 43(a) of the Lanham Act, unfair competition is codified by 15 U.S.C. § 1125(a)(1)(A), while false advertising is codified by 15 U.S.C. § 1125(a)(1)(B).  Accordingly, the court will only address the unfair competition part of section 43(a):

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).

*Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 202 (3d Cir. 1999)).

### 1.    Validity, protectability, and ownership

Federal registration of a mark is *prima facie* evidence of validity, protectability, and ownership. *See* 15 U.S.C. §§ 1057(b). However, the presumption of validity only extends to "the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate." *Id.*; *Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1396 (3d Cir. 1985) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 48 (2d Cir. 1978) ("[E]ven if a mark is registered, the presumptive right to use it extends only so far as the goods or services noted in the registration certificate."). "If the [registered] mark . . . has not achieved incontestability,[10] then 'validity depends on proof of secondary meaning, unless the . . . contestable mark is inherently distinctive.'" *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 438 (3d Cir. 2000)* (quoting *Ford Motor Co. v. Summit Motor Prods.*, 930 F.2d 277, 292 (3d Cir. 1991)). "A mark is inherently distinctive if it may be fairly characterized as arbitrary, fanciful, or suggestive." *Id.* at 438 n.5.

Here, the defendants argue that the plaintiff cannot establish the first two elements for trademark infringement under the Lanham Act because insurance and investment management services are "two distinctly different businesses." (D.I. 58 at 9.) The court disagrees. The plaintiff's Arrowpoint Marks were federally registered on August 12, 2008. (D.I. 1, Ex. A.) Both certificates of registration expressly state that the marks are "for: writing property casualty

---

[10] "A trademark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years, and that there is no pending proceeding and there has been no adverse decision concerning the registrant's ownership or right to registration." *Fisons*, 30 F.3d at 472 n.7; 15 U.S.C. §§ 1058, 1065. Incontestability is not at issue in this case. The Arrowpoint Marks were first used in commerce in March 2007 and the present litigation was initiated less than three years later in February 2010.

**JA-11**

insurance; underwriting in the fields of property and casualty insurance; insurance claims processing; insurance claims servicing, namely, claims administration and premium rate computing; actuarial services; and insurance consulting services." (D.I. 1, Ex. A.) As such, the plaintiff's certificates of registration specify purely insurance-related services, and are devoid of any indication that the Arrowpoint Marks are used for investment management services. Thus, the plaintiff's Arrowpoint Marks do not carry a presumption of validity in the area of investment management services. Nonetheless, the plaintiff argues, and the defendants do not dispute, that the Arrowpoint Marks are inherently distinctive. (*See* D.I. 48 at 13 ("Arrowpoint Marks are arbitrary"); D.I. 58 at 12 ("ARROWPOINT is suggestive").) Therefore, the court finds that the plaintiff owns valid marks, which are legally protectable against the defendants' alleged infringement if a likelihood of confusion exists between the parties' marks. *See Interpace Cord v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir. 1983) (finding the use of mark "Lapp" on wire and cable infringed on the plaintiff's rights to that mark as applied to ceramic insulators); *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1255, 1228 (3d Cir. 1978) (finding the use of name "Scott" on household cleaners did not infringe the use of that mark on paper products).

### 2.    Likelihood of confusion

"To prove likelihood of confusion, plaintiffs must show that 'consumers viewing the mark would probably assume the product or service it represents is associated with the source of a different product or service identified by a similar mark.'" *Checkpoint Sys. v. Check Point Software Tech.*, 269 F.3d 270, 279 (3d Cir. 2001) (quoting *Scott Paper*, 589 F.2d at 1229). The Third Circuit has adopted a ten-factor test, known as the "*Lapp* test," to determine likelihood of confusion in the market for both competing and noncompeting goods. *Victoria's Secret*, 237 F.3d at 215. The factors are:

8

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;
> (2) the strength of the owner's mark;
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
> (4) the length of time the defendant has used the mark without evidence of actual confusion arising;
> (5) the intent of the defendant in adopting the mark;
> (6) the evidence of actual confusion;
> (7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;
> (8) the extent to which the targets of the parties' sales efforts are the same;
> (9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;
> (10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

*Id.* No single factor is determinative in the likelihood of confusion analysis, and each factor must be weighed and balanced against one another. *Checkpoint*, 269 F.3d at 280. Further, "the Lapp test is a qualitative inquiry . . . [and] the different factors may properly be accorded different weights depending on the particular factual setting." *Victoria's Secret*, 237 F.3d at 215.

Here, the plaintiff argues that the defendants' use of the "Arrowpoint" element in their names "has caused repeated instances of actual confusion among even the most sophisticated financial institutions and is likely to cause additional confusion among customers." (D.I. 48 at 10.) In essence, the plaintiff contends that brokerage personnel who handle fixed-income securities transactions "have been misled into mistaking one entity for the other or into believing that the entities are in some way affiliated or related." (*Id.* at 14.) The defendants vehemently dispute that any confusion exists and contend that "the high level of consumer sophistication [in

this case] obviates any link between the alleged supplier confusion and any potential or actual effect on a consumer's purchasing decision."[11]  (D.I. 58 at 15.)

The parties focus their likelihood of confusion arguments on the respective ARROWPOINT word marks and do not put forth any significant arguments regarding the logos. Nevertheless, the court will address logos in addition to the word marks.  Additionally, because the evidence of actual confusion is integral to many of the parties' arguments, the court will address the *Lapp* factors in a modified sequence.[12]

### a.   Degree of similarity between the marks

Marks are confusingly similar "if ordinary consumers would likely conclude that [the services] share a common source, affiliation, connection or sponsorship." *Fisons*, 30 F.3d at 477.  The proper legal test for mark similarity is "whether the [marks] create the same overall impression when viewed separately." *Fisons,* 30 F.3d at 477.  "Overall impression is created by the sight, sound, and meaning of the mark." *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 183 (3d Cir. 2010).  When comparing the marks, each should be viewed in their entirety, giving greater force and effect to the dominant feature. *Country Floors, Inc. v. P'ship Composed of Gepner and Ford*, 930 F.2d 1056, 1065 (3d Cir. 1991).

As a starting point, the parties' logos --  Arrowpoint Capital  and     /A\     -- are not confusingly similar because they do not create the same overall impression. *Fisons,* 30

---

[11] The defendants argue that "[t]he primary focus of the Lanham Act is consumer confusion" and "trademark laws protect only against confused purchasing decisions, not against confusion generally." (D.I. 58 at 15.)  The court disagrees.  Under established Third Circuit law, the Act covers "the use of trademarks which are likely to cause confusion, mistake, or deception *of any kind*, not merely of purchasers nor simply as to source of origin." *Kos Pharm.*, 369 F.3d at 711.  Accordingly, the court must analyze all incidents of confusion related to the parties' marks.

[12] The parties agree *Lapp* factor 10 – facts suggesting the public might expect the plaintiff to expand and offer services in the defendants' market -- is neutral because it does not apply in this case.

10

F.3d at 477.  Indeed, the similarity is negligible.  Both logos contain a chevron reminiscent of an arrowhead, and a horizontal line.  However, the AC Logo chevron is small in relation to the overall size of the mark, and its use in place of the letter "A" as part of the logo's dominant feature -- the phrase "Arrowpoint Capital."  In contrast, the AAM Logo uses a large chevron surrounded by parallel lines to create its dominant feature, which is prominently placed in the center of the mark.  Further, the full-color versions of the logos are even more distinct.  The AC Logo is dominated by blue lettering and has a thin red accent line.  On the other hand, the AAM Logo contains four distinct colors, and its use of color draws the viewer's eye to the center of the mark.  In sum, the parties' logos are unlikely to be confused because they do not "create the same overall impression when viewed separately."  *Fisons,* 30 F.3d at 477.

However, the word marks are much more similar.  "Arrowpoint" is the dominant feature and it appears as the first word in all of the marks.[13]  The defendants' additional terms "asset management," "partners," "fundamental opportunity fund," and "structured opportunity fund" do change the overall visual impact and sound of the marks, but convey a meaning somewhat similar to "capital."  *See Checkpoint.*, 269 F.3d at 281-82 (finding Check Point Software "very similar" to Checkpoint Systems because "Software" and "Systems" are "generic or descriptive terms . . . [that] would not lead the average consumer to disassociate the products.").[14]  But courts in this circuit have found that very similar marks are able to coexist in the financial services market, where consumers take greater care than many others, when the parties use their

---

[13] *See* Arrowpoint Capital as compared to Arrowpoint Asset Management, Arrowpoint Partners, Arrowpoint Fundamental Opportunity Fund, and Arrowpoint Structured Opportunity Fund.

[14] *See also* J. Thomas McCarthy, 3 McCarthy on Trademarks and Unfair Competition, § 23:50 (4th ed. 2000) ("The Trademark Board has said that the general rule is that a subsequent user may not avoid likely confusion by appropriating another's entire mark and adding descriptive or non-distinctive matter to it."  An exception to that rule exists when "the marks in their entireties convey quite different meanings.").

full names in "official" communications. *See First Keystone Fed. Sav. Bank v. First Keystone Mortg., Inc.*, 923 F. Supp. 693, 704 (E.D. Pa. 1996); *Sav. Bank Life Ins. Co. of Mass. v. SBLI USA Mut. Life Ins. Co.*, C.A. No. 00-3255, 2000 U.S. Dist. LEXIS 17178, at *49 (E.D. Pa., Nov. 29, 2000).[15]    Accordingly, the court finds that the word marks are similar, but the dominant "Arrowpoint" feature is tempered when the marks are viewed in their entirety.    Therefore, with respect to the word marks, this factor slightly favors the plaintiff.

### b.    Strength of the owner's mark

"To determine the strength of the mark, courts look to (1) the inherent features of the mark contributing to its distinctiveness or conceptual strength and (2) the factual evidence of the mark's commercial strength or of marketplace recognition of the mark." *Sabinsa*, 609 F.3d at 184-85 (citing *Victoria's Secret*, 237 F.3d at 221).

For conceptual strength, the court agrees with the defendants that the Arrowpoint Marks are "suggestive, indicating direction and precision."[16]    (D.I. 58 at 12.)    However, the marks conceptual strength is undermined by the lack of evidence demonstrating commercial strength. The plaintiff's solitary support for commercial strength is that it has spent approximately $390,000 promoting its marks.  (D.I. 73 at 8.)  The court is unable to gauge whether that sum spent on promotional efforts is sufficient to establish marketplace recognition for investment management services.  By way of comparison, the defendants claim to have spent almost double

---

[15] *See also Omicron Capital, LLC. v. Omicron Capital, LLC*, 433 F. Supp. 2d 382,391 (S.D.N.Y. 2006) (finding identical word marks for financial services unlikely to cause confusion because they are not broadly marketed to the public, and "prospective purchasers are unlikely to perceive the marks before becoming familiar with the parties' businesses.").

[16] *See Sabinsa*, 609 F.3d at 185 (citation and internal quotation marks omitted) ("Arbitrary or fanciful marks [like Kodak] use terms that neither describe nor suggest anything about the product. Suggestive marks [like Coppertone] require consumer imagination, thought, or perception to determine what the product is.").

that amount -- $736,000 -- for the same purpose.[17]   (D.I. 58 at 5.)   Accordingly, the court is not

convinced that the Arrowpoint Marks have obtained any significant commercial strength, which

weakens the overall strength of the mark.  Therefore, the court finds that the factor is neutral.

### c.    Evidence of actual confusion

"Evidence of actual confusion is . . . highly probative of a likelihood of confusion."

*Sabinsa*, 609 F.3d at 187.  However, a court may discount evidence of actual confusion that is

"isolated and idiosyncratic."  *Victoria's Secret*, 237 F.3d at 227.  Further, "[c]onfusion is not

actionable where it is not shown . . . [to have] resulted from confusion between the two

companies as opposed to mere carelessness or accident." *First Keystone*, 923 F. Supp. at 706.

Here, the plaintiff produced no evidence of actual customer confusion.  Instead, it argues

that "broker dealers at global financial institutions, including Bank of America, Barclays,

Citigroup, RBS, and Morgan Stanley, all have been misled into mistaking one entity for the other

or into believing that the entities are in some way affiliated or r elated."   (D.I. 48 at 14.)

Specifically, the plaintiff provides three categories of alleged actual confusion: 1) third-party

inquiries about the relationship between the parties;[18] 2) misdirected trades;[19] and 3) incidents of

---

[17] The court notes that the defendants' purported marketing expenditures may be "highly inflated" and include the defendants founder's travel expenses "for any purpose." (*See* D.I. 73 at 8 n.14.)

[18] For example, in April 2009, a Royal Bank of Scotland ("RBS") salesperson contacted the plaintiff regarding a large security purchase that the defendants had made using a different broker, and asked why the plaintiff had not engaged RBS for the transaction; in May 2009, an attorney for Barclays Capital negotiating a security agreement for the plaintiff asked whether it was "a different entity from the arrowpoint that is being represented by [a different law firm]"; and in April 2010, in connection with a securities agreement, Citigroup sent a request for general information regarding the plaintiff, and asked it to do the same exercise for two of the defendants entities – Arrowpoint Fundamental Opportunity Fund and Arrowpoint Structured Opportunity Fund. (D.I. 48 at 6-8.)

[19] On three occasions between April and July 2009, JPMorgan Chase & Co. ("JPMorgan") misallocated the defendants' trades to the plaintiff's brokerage account.  (D.I. 48 at 6-7.)  However, the plaintiff rejected each trade before settlement.  In addition, the plaintiff's representative testified that misallocated trades are not uncommon in the financial services industry.  (D.I. 58 at 15 n.6.)

mistaken identity, which inhibited the plaintiff's ability to complete trades.[20]   (D.I. 48 at 6-8.)

The court views many of the alleged inquiries about the affiliation between the parties "with great skepticism, given the interested sources and the inability to cross-examine the supposedly confused individuals." *Victoria's Secret*, 237 F.3d at 227.   In addition, the court has not been presented sufficient evidence to determine whether the misdirected trades were the result of actual confusion between the parties as opposed to mere carelessness, mistake, or clerical error on a broker's part.   *See First Keystone*, 923 F. Supp. at 706.   Indeed, it appears as if JPMorgan was the only financial institution that misdirected trades.   There is also no evidence to establish that three misdirected trades are significant, especially since the record is devoid of the number of trades that were executed without incident.   *See* Note 19, *supra*; *Victoria's Secret*, 237 F.3d at 227 (finding a court may discount evidence of actual confusion that is "isolated and idiosyncratic").   The remaining allegations do present some evidence of actual confusion between the parties by broker-dealers.   But, again, the record does not convince the court that the few remaining alleged incidents translate to a more general likelihood of confusion as a matter of law, especially since the record is devoid of any inference of customer confusion.   Therefore, the court finds that this factor slightly favors the plaintiff.

      **d.**    **Customer care and sophistication**

---

[20] The plaintiff alleges that in Summer 2009, Citigroup delayed its application to acquire certain securities, in part, due to confusion between its account and another applicant, AAM, which inhibited the review and submission of both applications; and in August 2009, the plaintiff attempted to participate in a corporate bond offering through RBS, but was informed that it would not receive an allocation because it was mistaken for a hedge fund operating out of Colorado. (D.I. 48 at 8.) In response, the defendants argue that the alleged confusion at Citigroup did not prejudice the plaintiff's application because it applied under the ARROWOOD name, and the plaintiff's applications were deferred because Citi gave preference to large orders and the plaintiff was one of the smallest participants. (D.I. 58 and 16.) Similarly, the defendants argue that the plaintiff was able to resolve whatever error occurred in the 2009 RBS bond offering and it did get an allocation. (*Id.* at 15 n.6.)

"When consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion. Where the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations." *Checkpoint,* 269 F.3d at 284.

Here, the plaintiff concedes that "[c]ustomers of [the parties'] investment services are likely to be careful and sophisticated." (D.I. 48 at 13.)  The defendants echo that premise and argue that customers of both parties invest large sums, usually at least $1 million, and investments in the defendants' hedge funds are "locked up" for 12 months, with penalties for early withdrawal. (D.I. 58 at 13-14.)  Further, the defendants' potential customers are "high net worth individuals, institutional investors, or endowment funds" that often perform due diligence on the defendants before investing, (*id.*) and the plaintiff's potential customers are "insurance companies and pension funds," (D.I. 48 at 1).  As such, the court finds that "the buyer class consists of sophisticated or professional purchasers" that "exercise heightened care in evaluating the relevant products before making purchasing decisions." *Checkpoint,* 269 F.3d at 284. Moreover, both parties acknowledge that they make individual, face-to-face presentations to potential investors, (*see id.* at 13; D.I. 48 at 14), which militates against a likelihood of confusion.  Accordingly, this factor strongly favors the defendants due to the amount of money involved and the high level of customer sophistication.

> **e.  Length of time the defendant has used the mark without evidence of actual confusion arising**

The defendants contend that they began using their mark in December 2007 and the plaintiff's first alleged instance of actual confusion did not occur until more than a year later --

April 2009. (D.I. 58 at 14.) In contrast, the plaintiff asserts that the April 2009 confusion occurred less than one month after the defendants began investing in earnest under its Arrowpoint Opportunity Fund mark. (D.I. 48 at 13.) The court is unable to thoroughly assess this factor given the nature of the alleged "actual confusion," and the lack of evidence regarding the amount and type of trades the parties executed during the same timeframe. Therefore, this factor is neutral.

### f.    The defendants' intent in adopting the mark

"[E]vidence of intentional, willful and admitted adoption of a mark closely similar to the existing marks weighs strongly in favor of finding the likelihood of confusion." *Checkpoint,* 269 F.3d at 286 (citation and internal quotation marks omitted). Here, the defendants assert that "AAM selected its marks because arrowpoints had personal significance to [AAM's founder] and to suggest a connection between digging for arrowpoints and the thorough manner in which AAM conducts the fundamental research on which it bases its investment management services." (D.I. 58 at 3.) In addition they argue that AAM adopted its mark in good faith based on a clearance procedures that included counsel's review of a full U.S. availability trademark search report, which indicated that the plaintiff was engaged in property and casualty insurance, not investment management or related services. (*Id.*) As such, "[t]here is no evidence or even inference that [the] defendant[s] chose its name with [the] plaintiff's name or product in mind." *Checkpoint,* 269 F.3d at 286. Therefore, this factor favors the defendants.

### g.    Channels of trade and advertising media

"The greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." *Checkpoint,* 269 F.3d at 288-89 (citation omitted). Here, both parties promote their services through industry meetings, events, and direct presentations to prospective

clients.  (*See* D.I. 48 at 2; D.I. 58 at 17.)  However, the defendants target events of interest to hedge fund investors, family foundations, and endowments.  (D.I. 58 at 17.)  The plaintiff concedes that it does not attend such events "because it is not a hedge fund."[21]  (D.I. 73 at 4.) Attendance at different sets of industry events cuts against a likelihood of confusion.  *See Checkpoint,* 269 F.3d at 289.  Further, the defendants rely on word-of-mouth referrals, (*id.* at 4), which intuitively eliminate the possibility of confusion.  Finally, it cannot be over stressed that both parties use direct client presentations incorporating their respective logos, which are visually distinct.  Thus, this factor strongly favors the defendants.

> **h.    Similarity of target customers & The relationship of the goods in the minds of customers**

The parties generally seek distinct groups of customers that are sophisticated and unlikely to view the parties' services as related or similar.  The plaintiff targets customers "experiencing some sort of financial distress," while the defendants pursue "high net worth individuals and institutional investors," not distressed companies.  (D.I. 58 at 17-18.)  The defendants do concede that insurance companies and pension funds are potential clients for both parties,[22] but they argue that those clients would retain the parties for different purposes -- the plaintiff's expertise is in fixed-income investments, while the defendants claim to "offer expertise across the capital spectrum."  (*Id.*)  In response, the plaintiff argues that any distinctions between the parties' services and clients are irrelevant given the overlap between their investment activity at

---

[21] The plaintiff does argue that the parties have attended the same industry events, which have resulted in "actual confusion.  (D.I. 73 at 4.)  The alleged "actual confusion" involved one of the plaintiff's employees, who was wearing an Arrowpoint Capital name badge, being asked whether he was associated with "Arrowpoint in Denver" by a person manning a trade booth.  The court finds that such an encounter at a trade show does not affect its analysis of this factor.

[22] The plaintiff alleges that "the defendants have promoted their investment management services to at least eight insurance companies, four public pension plans, and three corporate pension plans."  (D.I. 48 at 5.)

various brokerage firms, which has led to actual confusion. (D.I. 73 at 9.)  The court disagrees.

The distinctions between the parties' services and clients are the relevant inquiries under these two factors.  "[W]hen the parties target their sales efforts to the same group of consumers, there is a greater likelihood of confusion between the two marks." *Sabinsa*, 609 F.3d at 188 (citation omitted).  However, "[i]f the products fall under the same general product category but operate in distinct niches, they will probably not be closely related." *Id.* at 189 (citation and internal quotation marks omitted).  The court finds that, while some potential customers may overlap, there is little likelihood of customer confusion because the parties offer distinctly different investment management strategies to generally different classes of investors.

Further, any purported actual confusion by the broker dealers is not due to the *clients targeted* or the *investment management services* offered and should not be considered under these factors. Rather, any broker-dealer confusion is attributable to the similarity of the marks and the fungible nature of commonly traded securities.  Stated differently, a particular fixed-income security is an identical "good" in the mind of a broker dealer regardless of what entity is purchasing it for *a particular client* based on *an individualized investment strategy*.  As such, any weight attributable to broker-dealer confusion is properly assessed by the "actual confusion" *Lapp* factor.  Therefore, the court finds that these factors favor the defendants.

### 3.    Lanham Act claims summary

The above analysis demonstrates that the balance of *Lapp* factors tips in favor of the defendants.  Importantly, the parties promote their specialized investment services using direct presentations to generally distinct groups of prospective customers, which include sophisticated or professional purchasers that invest large sums of money.  While similarities exist between the parties' word marks, the respective logos are distinct, and the overall strength of plaintiff's marks

18

is weakened by a lack of commercial strength. Further, the limited incidents of broker-dealer confusion are not dispositive of a likelihood of confusion in the marketplace, and do not outweigh the factors in the defendants' favor. Accordingly, the plaintiff has not shown a likelihood of confusion in the marketplace. Therefore, the plaintiff has not proven a likelihood of success on the merits for its Lanham Act claims.

### B.    Likelihood of success on the merits - common law infringement and DTPA claims

Because the plaintiff failed to carry its burden for proving a likelihood of confusion, the court does not need to address the plaintiff's state law trademark claims at length. The plaintiff concedes in its opening brief that trademark infringement under the common law and DTPA are subject to the Lanham Act standard for trademark infringement. (D.I. 48 at 11.) In addition, the plaintiff relies upon its trademark infringement likelihood of confusion arguments to establish unfair competition and false advertising under the DTPA. Therefore, the court finds that the plaintiff has not proven a likelihood of success on the merits for its state law trademark claims.

## V.    CONCLUSION

For the reasons stated above, the court will deny the plaintiff's motion for a preliminary and permanent injunction.

Dated: May 20, 2014

_____
CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ARROWPOINT CAPITAL CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.  10-161-GMS |
| | ) | |
| ARROWPOINT ASSET MANAGEMENT, | ) | |
| LLC; ARROWPOINT PARTNERS GP, LLC; | ) | |
| ARROWPOINT PARTNERS GP2, LLC; | ) | |
| ARROWPOINT FUNDAMENTAL | ) | |
| OPPORTUNITY FUND, LP; and | ) | |
| ARROWPOINT STRUCTURED | ) | |
| OPPORTUNITY FUND, LP, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

At Wilmington, this 20th day of May, 2014,

IT IS HEREBY ORDERED THAT Arrowpoint Capital Corp.'s Motion for a Preliminary and

Permanent Injunction (D.I. 4) is DENIED.

CHIEF, UNITED STATES DISTRICT JUDGE